# FEDERAL DEFENDER
# SENTENCING GUIDELINES COMMITTEE

Lyric Office Centre
440 Louisiana Street, Suite 1350
Houston, Texas 77002-1634

Chair: Marjorie Meyers                                    Phone: 713.718.4600

February 20, 2017

Honorable William H. Pryor
Acting Chair
United States Sentencing Commission
One Columbus Circle, N.E.
Suite 2-500, South Lobby
Washington, D.C. 20002-8002

**Re:    Public Comment on Proposed Amendments for 2017**

Dear Judge Pryor:

Defenders are grateful for the opportunities we have had to work with the Commission this year. We are also pleased to see a set of proposed amendments that hold the potential to make many improvements to the guidelines by reducing unnecessary and expensive reliance on imprisonment, reducing unwarranted disparity, and simplifying their application. Our specific comments follow.

I.      Proposed Amendment #1: First Offenders/Alternatives to Incarceration ....................... 2

II.     Proposed Amendment #2: Tribal Issues ....................................................... 19

III.    Proposed Amendment #3: Youthful Offenders............................................. 20

IV.     Proposed Amendment #4: Criminal History Issues ...................................... 37

V.      Proposed Amendment #5: Bipartisan Budget Act ........................................ 44

VI.     Proposed Amendment #6: Acceptance of Responsibility ............................. 47

VII.    Proposed Amendment #7: Miscellaneous Amendments............................... 58

VIII.   Proposed Amendment #8: Marihuana Equivalency...................................... 59

IX.     Proposed Amendment #9: Technical Amendments ...................................... 60

X.      Conclusion..................................................................................................... 60

Honorable William H. Pryor
February 20, 2017
Page 2

## I.      Proposed Amendment #1: First Offenders/Alternatives to Incarceration

Defenders applaud the Commission for exploring ways to amend the guidelines to encourage alternatives for "first offenders" and expand the Sentencing Table to provide more sentencing options. The Commission has proposed a definition of "first offender" that only includes individuals with no prior convictions. Individuals who qualify as "first offenders" would receive either a 1- or maybe 2- level decrease in offense level and some would be eligible for a rebuttable presumption of a non-incarceration sentence. The Commission also has proposed a consolidation of Zones B and C of the Sentencing Table. In both areas—the "first offender" provisions and the Zone expansion—the Commission seeks comment on a number of topics, including whether the definition of "first offender" should be expanded, and whether certain offense types or offense levels should be excluded.

We discuss these issues in detail below and offer additional suggestions on how the Commission can do more to encourage alternatives to incarceration that will meet the purposes of sentencing better than imprisonment-only-sentences. Our position is summarized here:

- The Commission should expand the definition of "first offender" to include individuals who have prior convictions that are never counted in computing criminal history points under Chapter Four including misdemeanor and petty offenses listed in §4A1.2(c); foreign convictions, §4A1.2(h); tribal convictions, §4A1.2(i); expunged convictions, §4A1.2(j); certain military convictions, §4A1.2(g). If the Commission adopts the proposal to exclude juvenile adjudications from §4A1.2 and accepts the Defender proposal to exclude any conviction committed before the age of 18, then those offenses also should not preclude "first offender" status. The Commission also should include an invited downward departure for minor offenses that carry a term of imprisonment over one year.

- "First Offenders" with an offense level of 16 or less as determined under Chapters Two and Three should receive a 3-level reduction, and those with offense levels greater than 16 should receive a 2-level reduction. These reductions, which are greater than those proposed by the Commission, will decrease the Zones for more "first offenders." The adjustment should be available to all "first offenders" regardless of their offense level determined under Chapters Two and Three.

- The Commission should include an invited downward departure for nonviolent "first offenders" (e.g., drug trafficking and fraud) who fall within Zones C or D so that the guidelines give the court the option of imposing an alternative sentence.

- The proposed amendment to §5C1.1 (Imposition of a Term of Imprisonment), which creates a rebuttable "presumption" of an alternative sentence should only exclude

Honorable William H. Pryor
February 20, 2017
Page 3

individuals whose offense of conviction resulted in serious bodily injury as defined in §1B1.1, comment. (n.1(L)).

- The proposed application note to §5C1.1 (Application of Subsection (g)) need not state that a sentence of imprisonment is necessary for individuals excluded from the rebuttable presumption of probation. The note also should not state that "[t]he court may not impose a sentence of probation pursuant to this provision . . . where a term of imprisonment is required under the guideline."[1] In addition to amending §5C1.1, the Commission should amend §5B1.1 (Imposition of a Term of Probation) to be consistent with §5C1.1's presumption of an alternative sentence language.

- Rather than simply consolidate Zones B and C of the Sentencing Table, Defenders encourage the Commission to also expand Zone B by 2 levels to an 18-24 month range. Such an expansion would increase the number of individuals likely to benefit from Zone B Sentencing Options, while also protecting public safety. In addition, the Commission should not provide a mechanism to exempt certain offenses from the zone changes.

- We request that the Commission continue to include in the commentary to §5C1.1 an invited departure for individuals who suffer from a substance abuse disorder or mental illness.

- The Commission also should delete §5C1.1, comment. (n.7) (proposed note 5), which discourages the use of substitutes for imprisonment for those in criminal history category III or above even if the individual falls within Zone B.

- Defenders have no objection to the amendment to §5F1.2 regarding Home Detention.

### A. Alternatives to Incarceration Are an Important Mechanism to Promote Public Safety and Meet the Purposes of Sentencing

The Commission's effort to increase the use of alternatives to incarceration promotes public safety, serves more purposes of sentencing than imprisonment, and is consistent with many of the Commission's statutory obligations to formulate guidelines, including the need for the guidelines to "reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process."[2] Eight years ago, the Commission issued a report that states:

---

[1] The prohibition on a sentence of probation when "a term of imprisonment is required under §5C1.1" also should be removed from the background commentary to §5B1.

[2] 28 U.S.C. § 994(b)(1)(C).

Honorable William H. Pryor
February 20, 2017
Page 4

> Effective alternative sanctions are important options for federal, state, and local criminal justice systems. For the appropriate offenders, alternatives to incarceration can provide a substitute for costly incarceration. Ideally, alternatives also provide those offenders opportunities by diverting them from prison (or reducing time spent in prison) and into programs providing the life skills and treatment necessary to become law-abiding and productive members of society.[3]

Recently, former Acting Attorney General Sally Yates acknowledged that "current incarceration levels are simply not fiscally sustainable" and that "diverting so much of our public resources to incarceration is undermining, not enhancing, public safety."[4] The most effective way to promote public safety is to ensure that convicted persons "return to society more prepared—not less—to lead law-abiding lives."[5] The best way to accomplish that goal for many individuals is through a non-incarceration sentence, particularly since "[r]esearch suggest that incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections.[6] Alternatives to incarceration are far more likely than prison to meet a person's rehabilitative needs and strengthen the communities in which they reside. A recent report from the Harvard Kennedy School and the National Institute of Justice notes how a conviction, combined with a prison sentence, has devastating collateral consequences.[7] Such consequences include the loss of employment prospects, an increased likelihood of health problems, increased poverty rates and behavioral problems for children of incarcerated parents, and increased racial disparities.[8]

Guidelines that encourage the use of alternatives to incarceration help the Commission fulfill its statutory obligation to formulate guidelines that "minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prison." 28 U.S.C. § 994(g). BOP continues to

---

[3] USSC, *Alternative Sentencing in the Federal Criminal Justice System* 2-3 (2009).

[4] U.S. Dep't of Justice, *Deputy Attorney General Sally Q. Yates Delivers Remarks at Harvard Law School on Sentencing and Prison Reform, Cambridge, MA, United States* (Jan. 9, 2017), https://www.justice.gov/opa/speech/deputy-attorney-general-sally-q-yates-delivers-remarks-harvard-law-school-sentencing-and.

[5] *Id.*

[6] Nat'l Inst. of Corrs., *Myths & Facts - Why Incarceration Is Not the Best way to Keep Communities Safe* 1, 4 (2016), https://s3.amazonaws.com/static.nicic.gov/Library/032698.pdf.

[7] Wendy Still et al., *Building Trust and Legitimacy Within Community Corrections*, Harvard Kennedy School and Nat'l Inst. of Just. 13-18 (2016), https://www.hks.harvard.edu/content/download/82224/1844712/version/2/file/building_trust_and_legitimacy_within_community_corrections_rev_final_20161208.pdf.

[8] *Id.*

Honorable William H. Pryor
February 20, 2017
Page 5

face challenges with inmate crowding[9] and the yearly cost of imprisonment ($31,976) is 7.8 times higher than the cost of post-conviction supervision ($4.097).[10] These high costs of imprisonment continue to consume resources that could be used for more effective programs aimed at promoting public safety. Because "crowding has a negative impact on the ability of the BOP to promptly provide inmate treatment and training programs that promote effective reentry and reduce recidivism,"[11] the better option is to maximize the use of alternatives to incarceration for "first offenders" and others convicted of crimes for which Congress has authorized probationary or split sentences.

Guidelines that encourage greater use of alternatives to incarceration also are consistent with the Commission's statutory mandate to construct guidelines aimed at meeting all the purposes of sentencing,[12] including meeting the rehabilitative needs of the defendant through means other than a sentence of imprisonment[13] and that reflect "advancement in knowledge of human behavior as it relates to the criminal justice process."[14]

For several years, U.S. Probation has "expanded its training programs pertaining to evidence-based supervision practices."[15] In addition to using actuarial risk assessment instruments to help determine appropriate levels of supervision and assess a person's rehabilitative needs, many probation offices are now using STARR (Staff Training Aimed at Reducing Re-Arrest) skills. "STARR skills include specific strategies for active listening; role clarification; effective use of authority, disapproval, reinforcement, and punishment; problem solving; and teaching, applying, and reviewing the cognitive model."[16] A study published in December 2015 shows that

---

[9] U.S. Dep't of Justice, *FY 2017 Performance Budget: Congressional Submission Federal Prison System Buildings and Facilities* 1 (2016), https://www.justice.gov/jmd/file/821371/download. In FY 2016, BOP did not meet its goal of reducing the percentage of system-wide overcrowding. U.S. Dep't of Justice, *FY 2016 Agency Financial Report* I-14, III-12 (2016) ("As of September 30, 2016, BOP's institutions remained 16 percent over rated capacity, and high security institutions were 31 percent over rated capacity").

[10] This information is from the Administrative Office of the U.S. Courts, as of June 24, 2016.

[11] *FY 2017 Performance Budget*, *supra* note 9.

[12] 28 U.S.C. § 994(a)(2).

[13] 28 U.S.C. § 994(k).

[14] 28 U.S.C. § 991(b)(C).

[15] Matthew Rowland, Chief, Prob. and Pretrial Services Office, Admin. Office of the U.S. Courts, *Introduction* to Laura Baber, *Inroads to Reducing Federal Recidivism*, 79 Fed. Prob. J. 3, 3 (Dec. 2015).

[16] Probation and Pretrial Services-Annual Report 2015, http://www.uscourts.gov/statistics-reports/probation-and-pretrial-services-annual-report-2015.

Honorable William H. Pryor
February 20, 2017
Page 6

"[m]easurable decreases in federal recidivism coincide with concerted efforts to bring to life state-of-the-art evidence-based supervision practices into the federal system, including the development and wide-scale implementation of a dynamic risk assessment instrument, emphasis on targeting person-specific criminogenic needs and barriers to success, and training on core correctional practices."[17] As the report states: "despite the increase in risk of the federal post-conviction supervision population and several years of austere budgets, probation officers are improving their abilities to manage risk and provide rehabilitative interventions."[18]

### B.  Definition of First Offender

A critical issue in this proposed amendment is the definition of "first offender." The Commission requests comment on whether it should "broaden the scope of the term 'first offender'" beyond "defendants with no prior convictions of any kind." Defenders strongly urge the Commission to broaden the definition to include individuals with prior convictions that are excluded from counting for criminal history purposes under §4A1.2. Specifically, individuals should not be excluded from "first offender" status on the basis of convictions for misdemeanor and petty offenses listed in §4A1.2(c), military sentences imposed by a summary court-martial or Article 15 proceeding (§4A1.2(g)), foreign convictions (§4A1.2(h)), tribal convictions (§4A1.2(j)), or expunged convictions (§4A1.2(i)). And for the same reasons discussed in the comments on "youthful offenders," offenses committed before age 18, or at least juvenile adjudications, should be excluded.

The exclusion of minor offenses under §4A1.2(c), is supported by available data on recidivism rates. Although the Commission's recent data analysis did not compare the recidivism rates for individuals with no prior convictions to those with prior convictions for offenses listed in 4A1.2(c), a 2004 report of the Commission showed that individuals who had convictions under 4A1.2(c) only had a reconviction recidivism rate of 2.9%, which was substantially similar to the 2.5% rate for individuals with no prior convictions.[19] In short, the available evidence shows that public safety is not undermined by including in the definition of "first offender" individuals with these types of prior convictions.

Depriving individuals with minor misdemeanors from the benefits of "first offender" status would exacerbate racial disparity. Professor Alexandra Natapoff at Loyola Law School has identified the numerous "systemic implications" of misdemeanor prosecutions, including how

---

[17] Laura Baber, Chief, Nat'l Program Dev. Div., Prob. and Pretrial Services, Admin. Office of the U.S. Courts, *Inroads to Reducing Federal Recidivism*, 79 Fed. Probation J. 3, 3 (Dec. 2015).

[18] *Id.* at 8.

[19] USSC, *Recidivism and the "First Offender": A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate* 14, n.27 & 28 (2004).

Honorable William H. Pryor
February 20, 2017
Page 7

"misdemeanor processing is the mechanism by which poor defendants of color are swept up into the criminal justice system, i.e., 'criminalized,' with little or no regard for their actual guilt."[20] The history of misdemeanor prosecutions shows that they have been "social and economic governance tools" used predominantly in urban areas to "manage various disadvantaged populations."[21] Many minor offenses have significant impact on people of color and the poor. "Police use loitering, trespassing, and disorderly conduct arrests to establish their authority over young black men, particularly in high crime areas, and to confer criminal records on low-income populations of color."[22] The over-policing of poor neighborhoods of color caused by the use of "zero-tolerance" policies often results in disproportionate convictions for loitering, trespassing, and disorderly conduct.[23] In addition, driving on a suspended license, which constitutes a sizable portion of local misdemeanor dockets, is an offense that has a disproportionate impact on the poor. Such offenses criminalize poverty because suspensions often occur when a low-income person cannot afford to pay the fine for a simple traffic violation. [24]

Excluding from "first offender" status individuals with minor convictions also raises significant due process concerns. Many individuals charged with misdemeanor offenses have a greater incentive to plead guilty so they can get out of jail and often do so without defense counsel or with counsel that only have minutes to handle a case.[25] Consequently, the frequency of wrongful convictions for such offenses is troubling.[26]

---

[20] Alexandra Natapoff, *Misdemeanors*, 85 S. Cal. L. Rev. 1313, 1313 (2012).

[21] Alexandra Natapoff, *Criminal Misdemeanor Theory and Practice*, Oxford Handbooks Online 3 (2016).

[22] *Id.* at 5.

[23] *See generally* K. Babe Howell, *Prosecutorial Discretion and the Duty to Seek Justice in an Overburdened Criminal Justice System*, 27 Geo. J. Leg. Ethics 285, 286 (2014).

[24] Natapoff, *Criminal Misdemeanor Theory and Practice*, *supra* note 21, at 4.

[25] *See generally* Alexandra Natapoff, *Aggregation and Urban Misdemeanors*, XL Fordham Urb. L. J. 101, 147 (2013) (discussing how "a young black male in a poor urban neighborhood out in public at night has a predictable chance of being arrested for and ultimately convicted of a minor urban offense of some kind, whether he commits any criminal acts or not"); Natapoff, *Misdemeanors*, *supra* note 20, at 1348 ("bulk urban policing crimes such as loitering, trespassing, disorderly conduct, and resisting arrest create the highest risk of wrongful conviction"); Robert Boruchowitz, et al., Nat'l Assoc. of Crim. Defense Lawyers, *Minor Crimes, Massive Waste: The Terrible Toll of America's Broken Misdemeanor Courts* (2009); Alexandra Natapoff, *Why Misdemeanors Aren't So Minor*, Slate, Apr. 17, 2012 (discussing major consequences of misdemeanors), http://www.slate.com/articles/news_and_politics/jurisprudence/2012/04/misdemeanors_can_have_major_consequences_for_the_people_charged_.html; Jason Cade, *The Plea-Bargain Crisis for Noncitizens in Misdemeanor Courts*, 34 Cardozo L. Rev.1751, 1754, 1803-1810 (2013) (discussing incentives for persons charged with misdemeanors to plead guilty so that they can return to their families and jobs rather

Honorable William H. Pryor
February 20, 2017
Page 8

In addition to including within the definition of "first offender" individuals with minor convictions listed in §4A1.2(c), Defenders also encourage the Commission to include an invited downward departure for persons who would qualify for "first offender" status but for a conviction in a jurisdiction where minor offenses carry a prison term of over 1 year. As the Commission acknowledged when it promulgated amendment 798 to the career offender guideline, which included an invited downward departure for persons with misdemeanor offenses, "[s]uch statutes are found, for example, in Colorado, Iowa, Maryland, Massachusetts, Michigan, Pennsylvania, South Carolina, and Vermont."[27] These individuals should not be treated more harshly because of the arbitrariness of state criminal codes.

Defenders also encourage the Commission to include within the definition of "first offender," individuals with foreign, tribal, expunged, and certain military convictions that are not counted in the criminal history score,[28] as well as offenses committed before age 18, or at least juvenile adjudications. As the Commission is aware, the lack of due process associated with tribal and foreign convictions, and sentences resulting from summary court-martial or Article 15 proceedings raise serious questions about the legitimacy of the conviction. And foreign convictions can criminalize conduct that domestic law permits. It also would be anomalous, and more complicated, for the guidelines to not count certain convictions for calculating criminal history, but to consider them in determining whether a person qualifies as a "first offender."

### C.  Offense Level Decrease for First Offenders

Of the Commission's proposed options on the offense level reduction for "first offenders," Option 2 (a 2-level decrease if the offense level is less than 16 and a 1-level decrease if the offense level is 16 or greater) is plainly more beneficial than Option 1 (a 1-level decrease no matter the offense level).[29] Defenders believe, however, that the Commission can go one step farther by providing for a 3-level reduction in offense level for people with a final offense level of 16 or less and a 2-level reduction for individuals with a final offense level greater than 16. If the purpose of the amendment is for the guidelines to "reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender

---

than remain in jail pending a trial and elevated risk of noncitizens pleading guilty to misdemeanor offenses).

[26] *See* Natapoff, *Misdemeanors*, *supra* note 20, at 135-38, 143; *Cade*, *supra* note 25, at 1793 n.251 (discussing how pretrial detention leads to more wrongful convictions).

[27] USSG App. C, Amend. 798 (2015).

[28] §4A1.2(g)-(j).

[29] Option 1 proposes a 1-level decrease in offense level. Option 2 proposes a 2-level decrease if the offense level determined under Chapters Two and Three is less than level 16 and a 1-level decrease if the offense level is 16 or greater.

Honorable William H. Pryor
February 20, 2017
Page 9

who has not been convicted of a crime of violence or an otherwise serious offense,"[30] then that purpose would be better served if more people moved from Zone B into Zone A, and from Zone D into Zone C. For example, a 3-level decrease would permit a person with an offense level of 13 under Chapters 2 and 3, to move from Zone B into Zone A and have the option of a probationary sentence. Similarly, a 3-level decrease would permit a person with an offense level of 16 to move from Zone D into current Zone C or proposed Zone B. Compared to Option 2 of the Commission's proposed amendment, which would only decrease the Zones for 24.3% of "first offenders" in its FY 2014 sample,[31] Defenders' proposal would decrease the Zone for 27.5% percent of "first offenders."

The Commission requests comment on whether it should "limit the applicability of the adjustment to defendants with an offense level determined under Chapters Two and Three that is less than a certain number of levels" and if it should identify other "limitations or requirements." Defenders encourage the Commission to make the decrease in offense level available to all "first offenders" regardless of their offense level determined under Chapters Two and Three.

Making the adjustment available no matter the offense level would treat "first offenders" more fairly. The Commission's data analysis shows that a vast majority of "first offenders" fell within Zone D and have offense levels of 16 or greater. And a sizable number – 46.3 percent – of "first offenders" with final offense levels of 16 or higher were convicted of drug trafficking.[32] These are precisely the people who should receive lesser sentences. As the Honorable Patti Saris, former Chair of the Commission, wrote:

> [M]ass incarceration of drug offenders has had a particularly severe impact on some communities in the past thirty years. Inner-city communities and racial and ethnic minorities have borne the brunt of our emphasis on incarceration. Sentencing Commission data shows that Black and Hispanic offenders make up a large majority of federal drug offenders, more than two thirds of offenders in federal prison, and about eighty percent of those drug offenders subject to a mandatory minimum penalty at sentencing. In some communities, large segments of a generation of people have spent a significant amount of time in prison. While estimates vary, it appears that Black and Hispanic individuals are disproportionately under correctional control nationwide as compared to population demographics. This damages the economy and morale of communities and families as well as the respect of some for the criminal justice system.

---

[30] 28 U.S.C. § 994(j).

[31] USSC, *Public Data Presentation for First Offenders and Alternatives to Incarceration Amendment*, Slide 12 (2016).

[32] *Id*. at Slide 15.

Honorable William H. Pryor
February 20, 2017
Page 10

The Honorable Patti Saris, *A Generational Shift for Federal Drug Sentences*, 52 American L. Rev. 1, 10-11 (2015).

While the Commission lowered the offense levels for many drug cases, it did not do so for all of them, and it has taken no steps to acknowledge the different levels of culpability and lower risk of recidivism for "first offenders." For the Commission to exclude such persons from the benefit of a reduction in offense level would serve no purpose of sentencing. First, offense level is not correlated with recidivism, so no justification exists for imposing longer sentences on "first offenders" with higher offense levels.[33] Second, the notion that higher offense levels serve as a general deterrent[34] has long been debunked.[35] Third, a lengthier term of imprisonment is not necessary to promote just punishment. The Supreme Court acknowledged in *Gall* that the standard conditions of probation by themselves substantially restrict a person's liberty.[36] Fourth, as previously discussed, longer terms of imprisonment do not promote rehabilitation.

If the Commission wants to make an evidence-based decision, it should lower sentences for "first offenders" so that they do not spend much time in prison learning "more effective crime strategies from each other" and getting desensitized "to the threat of future imprisonment."[37]

### D.  Presumption of Non-incarceration Sentence for "First Offenders"

The proposed amendment to §5C1.1, which adds a presumption of a non-incarceration sentence for certain "first offenders," is a welcome change to the guidelines that hopefully will encourage courts to impose probationary sentences for "first offenders" falling within Zones A and B of the Sentencing Table. Defenders, however, believe that the proposed exclusions – [instant offense of conviction is a crime of violence] or [defendant used violence or credible threats of violence or possessed a firearm or other dangerous weapon in connection with the offense] – sweep too broadly. Defenders encourage the Commission to only exempt from the presumption of a non-incarceration sentence a defendant whose instant offense of conviction resulted in serious bodily

---

[33] USSC, *Recidivism Among Federal Offenders: A Comprehensive Overview* ("*Recidivism Report*") 20 (2016).

[34] The Commission's recidivism report notes that the "offense levels in the federal sentence guidelines were intended to reflect multiple purposes of punishment, including just punishment and general deterrence." *Id.* at 20.

[35] Nat'l Inst. of Justice, *Five Things About Deterrence* 1 (2016) ("The certainty of being caught is a vastly more powerful deterrent than the punishment"; "Sending an individual convicted of crime to prison isn't a very effective way to deter crime"; "Increasing the severity of punishment does little to deter crime."), https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.

[36] *Gall v. United States*, 552 U.S. 38, 48-49 (2007).

[37] *Five Things About Deterrence*, *supra* note 35, at 1.

Honorable William H. Pryor
February 20, 2017
Page 11

injury. While the Sentencing Reform Act directs that a "first offender who has not been convicted of a crime of violence or an otherwise serious offense," should receive a sentence other than imprisonment, it only singled out "a person convicted of a crime of violence that results in serious bodily injury" for a prison sentence.[38] Accordingly, nothing in the statute precludes the Commission from encouraging non-incarceration sentences for "first offenders" not "convicted of a crime of violence that results in serious bodily injury."

We are particularly concerned about the proposal to exclude individuals who "possessed a firearm or other dangerous weapon in connection with the offense." As the Commission is aware, a circuit split exists on whether an enhancement under §2D1.1(b)(1) ("if a dangerous weapon (including a firearm) was possessed, increase by 2 levels") precludes safety valve relief under §5C1.2(a)(2) ("the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense").[39] Courts are also split on whether constructive possession disqualifies a defendant from safety valve relief.[40] If the Commission were to adopt the proposal to exclude individuals who "possess a firearm or other dangerous weapon in connection with the offense," it would exacerbate the already existing circuit split and promote greater disparity. Therefore, if the Commission rejects our proposal to only exclude individuals whose offense of conviction resulted in serious bodily injury, it should only exclude defendants whose instant offense of conviction is a crime of violence as defined in §4B1.2(a).

The Commission requests comment on whether it should exclude other offenses, such as white collar crimes, from the presumption of a non-incarceration sentence. Defenders strongly oppose any such exclusion. First, for the reasons stated previously, sentences of imprisonment often do not serve the purposes of sentencing. Second, sentences of imprisonment severely limit the

---

[38] 28 U.S.C. § 994(j).

[39] *Compare United States v. Carillo-Ayala*, 713 F.3d 82, 89-91 (11th Cir. 2013) (holding that not all defendants who receive the enhancement under §2D1.1(b)(1) are precluded from safety valve relief) *with United States v. Ruiz*, 621 F.3d 390, 397 (5th Cir. 2010) (actual and constructive possession of a weapon under §2D1.1(b)(1) excludes safety valve relief).

[40] *See, e.g., United States v. Jackson*, 552 F.3d 908, 909-10 (8th Cir. 2009) (per curiam); *United States v. Matias*, 465 F.3d 169, 173-74 (5th Cir. 2006); *United States v. Herrera*, 446 F.3d 283, 287 (2d Cir. 2006); *United States v. Gomez*, 431 F.3d 818, 820-22 (D.C. Cir. 2005); *United States v. McLean*, 409 F.3d 492, 501 (1st Cir. 2005); *United States v. Stewart*, 306 F.3d 295, 327 n.19 (6th Cir. 2002); *Sealed Case*, 105 F.3d at 1463-65 (D.C. Cir. 1997). The Tenth Circuit, in contrast, has held that the scope of activity covered by §2D1.1(b)(1) is broader than that covered by §5C1.2, and that constructive possession does not preclude safety valve relief. *United States v. Zavalza-Rodriguez*, 379 F.3d 1182, 1188 (10th Cir. 2004).

Honorable William H. Pryor
February 20, 2017
Page 12

defendant's ability to pay restitution, which is often ordered in white collar cases[41] and do not achieve "penal objectives such as deterrence, rehabilitation, or retribution."[42] Third, the notion that all "first offenders" convicted of white-collar offenses should not get the benefit of a presumption of probation is ill-founded.

Our polling of Defenders revealed numerous clients who were "first offenders" who got involved in an economic crime out of desperation and efforts to support themselves or their family. They often stole to survive or were manipulated by others who took advantage of their desperate plight. They are not likely to reoffend, and for many, incarceration is a punishment greater than necessary to meet the purposes of sentencing under 18 U.S.C. § 3553(a). In such cases, imposing a prison sentence could cost society more than the original crimes because of the substantial cost of incarceration and the cost associated with removing the defendant from his or her family.

Three examples from the many cases involving "first time offenders" who faced terms of imprisonment under the guidelines, but who received probationary sentences, demonstrate our point. The first case involved a 54-year-old middle-school teacher, twice divorced, who suffered trauma and physical health issues and helped take care of her older sister with a serious chronic medical illness and in need of money to help meet basic needs and pay for medical expenses. She lost her mother and grandmother within a year of each other. The Veteran's Administration's (VA) benefits that her mother received following her father's death continued to be paid into a joint account that the client held with her mother. She suffered from depression, had a period of unemployment, and failed to inform the VA of her mother's death. Approximately $1400 a month was deposited into the account for almost 8 years, resulting in an overpayment of $142,494. She managed to repay $3000 after the VA contacted her about the overpayments and before any criminal charges were brought.

The second case involved a 62-year-old former military member and disabled plumber who wrote bad checks and made fraudulent bank transfers mainly to benefit his girlfriend who suffered from cancer and to be able to pay off his creditors. The total loss amount under the guidelines was $192,299.36, but the actual loss was $20,634.53.

The third case involved a loan processor with minor children who suffered from extensive physical and sexual abuse in her personal life and persistent mental illness that made her vulnerable to exploitation by her boss who led a scheme to inflate real estate appraisals to obtain

---

[41] The Mandatory Victim Restitution Act applies to an offense against property, including those committed by fraud or deceit. 18 U.S.C. § 3663A. Accordingly, defendants must compensate victims for the loss suffered. In FY 2015, restitution was ordered in 67.3% of fraud cases, with an average payment of $1,615,341 and a median payment of $125,200. USSC, *2015 Sourcebook of Federal Sentencing Statistics*, Tbl. 15.

[42] *United States v. Cloud*, 872 F.2d 846, 854 (9th Cir. 1989).

Honorable William H. Pryor
February 20, 2017
Page 13

mortgage loans that were substantially more than the actual cost of the house. She was ordered to pay restitution in the amount of $42,676,269.14.

Defenders are also concerned about the Commission's proposed application note 10 regarding application of the presumption of alternatives to incarceration for certain "first offenders" with a guideline range falling within Zones A or B. Proposed Note 10(A) states, among other things, that "[t]he court may not impose a sentence of probation pursuant to this provision . . . where a term of imprisonment is required under this guideline." Such a statement is inconsistent with 18 U.S.C. § 3553(a)(3), which "directs the judge to consider sentences other than imprisonment,"[43] and ignores the authority of the court to grant a departure or variance. Probation should not be discouraged for those who fall within Zones C or D, but whose offense of conviction is a Class C, D, or E felony or misdemeanor. Unless otherwise specified in the statute of conviction, 18 U.S.C. § 3561 only prohibits probationary sentences for Class A or B felonies. For the Commission to recommend imprisonment for any Class C, D, or E felony that falls within Zones C or D, regardless of whether the specific statute of conviction prohibits probation, would be inconsistent with 18 US.C. § 3561.[44]

To suggest that a court may not impose a sentence of probation when the guideline range falls within Zones C or D also disregards feedback that the Commission has received from the courts over the years. From 2005 to 2015, the "percentage of offenders with sentencing ranges in Zone D sentenced to alternatives has averaged about 12 percent."[45] The majority of those sentences were probation only or probation with community confinement sentences.[46] To avoid a conflict with the law and acknowledge the feedback that it is receiving from the courts about the appropriateness of probationary sentences for certain individuals falling within Zone D, the Commission should change the proposed application note as follows: "The court may not impose a sentence of probation pursuant to this provision if prohibited by statute. *See* §5B1.1 (Imposition of a Term of Probation)."[47]

The proposed application note also need not state that "[a] sentence of imprisonment may be appropriate in cases in which the defendant used violence or credible threats of violence or possessed a firearm or other dangerous weapon in connection with the offense." First, if the

---

[43] *Gall*, 552 U.S. at 59.

[44] 28 U.S.C. 994(b)(1) requires that the Commission "establish a sentencing range that is consistent with all pertinent provisions of tile 18, United State Code."

[45] USSC, *Alternative Sentencing in the Federal Criminal Justice System 1*7 (2015).

[46] *Id*.

[47] The prohibition on a sentence of probation when "a term of imprisonment is required under §5C1.1" also should be removed from the background commentary to §5B1.1.

Honorable William H. Pryor
February 20, 2017
Page 14

Commission, contrary to Defender recommendations, excludes such individuals from a presumption of a non-incarceration sentence in §5C1.1(c), then including it in an application note is redundant. Second, even if the Commission does not exclude such individuals from the presumption, the proposed note undercuts the presumption and potentially creates an interpretive problem about which party bears the burden of proof on whether the court should or should not impose a non-incarceration sentence. The best course of action would be to allow the presumption of an alternative to apply and let the government rebut the presumption by showing that the individual should actually be sentenced to a term of imprisonment.

### E.  Conforming Changes

The Commission requests comment on what conforming changes, if any, it should make if it were to promulgate Part A of the proposed amendment for "First Offenders." While the complicated nature of the guidelines makes it difficult to anticipate all the conforming changes that should be made, one change is apparent. In addition to amending §5C1.1, the Commission should amend §5B1.1 (Imposition of a Term of Probation) to be consistent with §5C1.1's presumption of an alternative sentence language. Simply adding subsection (c) to §5B1.1, with the exact language included in §5C1.1 would ensure that the presumption of an alternative sentence does not get overlooked for individuals who fall within Zones A and B of the guidelines.

In addition, Defenders suggest that the Commission change the language of §5B1.1 to call for a presumption of probation. The attached Appendix A sets forth our suggestions for how the language should be changed.

### F.  Zone Expansion

#### 1.  Zones B and C Should be Consolidated with Zone B Expanded to the Range of 18-24 Months

Defenders are pleased that the Commission is considering expanding the Zones of the Sentencing Table to encourage greater uses of alternatives to incarceration. In addition to consolidating Zones B and C of the Sentencing Table, Defenders encourage the Commission to expand Zone B by 2 levels to an 18-24 month range.[48] Such an expansion would increase the

---

[48] It is worth noting that in 1990, the USSC Advisory Committee on Alternatives, which included several federal court judges and experts from various other agencies/organizations, recommended that Zone D start at a much higher range (27-33 months) for individuals in CH I through III than it currently does (15-21 months). *See USSC Alternatives to Imprisonment Project, The Federal Offender: A Program of Intermediate Punishments* 78 (1990).

Honorable William H. Pryor
February 20, 2017
Page 15

number of individuals likely to benefit from Zone B Sentencing Options without jeopardizing public safety.[49]

The Commission's 2015 report on Alternative Sentencing in the Federal Criminal Justice System concluded that the low rate of alternatives to incarceration was "primarily [] due to the predominance of offenders whose sentencing ranges were in Zone D of the Sentencing Table, in which the guidelines provide for a term of imprisonment."[50] Notwithstanding that conclusion, individuals falling within Zone D are receiving alternatives to incarceration. For example, drug offenses were almost as common among individuals sentenced to alternatives (29%) as those sentenced to imprisonment (31.6%).[51]

And as the Commission's data analysis on "Zone C Offenders" likely to benefit from Zone B sentencing options shows, only 420 people sentenced in FY 2015 would have benefited from consolidation of the zones. A slight expansion of the new Zone B would increase those numbers without jeopardizing public safety because a large number of individuals falling within Zone D are convicted of non-violent offenses such as drug trafficking, money laundering, and fraud.[52] Moreover, an expansion of proposed Zone B to the 18-24 month range would likely have the most significant impact on individuals in criminal history category I. Data from FY 2013 to 2015 show that 1,318 individuals with a criminal history category I had an offense level of 14 (15-21 months) and 3,999 had an offense level of 15 (18-24 months).[53]

Data from the Commission's study shows that expanding Zone B to the 18-24 month range will not impact public safety. The reconviction rate for persons imprisoned from 12 to 23 months was 33.9%, just slightly above the 31.9% rate for those imprisoned 6 to 11 months.[54] At the same time, individuals with a probation only sentence had a recidivism rate of 21.6%.[55] Those rates,

---

[49] The Commission's data shows no strong correlation between offense level and recidivism. *Recidivism Report*, *supra* note 33, at 20,

[50] *Alternative Sentencing, supra* note 45, at 5.

[51] *Id*. at 18, Fig. 14.

[52] In FY 2015, 93.5% of persons convicted of drug trafficking, 53% of persons convicted of fraud, and 79% person of persons convicted of money laundering fell within Zone D. USSC, *FY 2015 Monitoring Dataset*.

[53] USSC, *Interactive Sourcebook,* tbl. 21 FY 2013-2015.

[54] *Recidivism Report*, *supra* note 33, at App. A-2.

[55] *Id*.

Honorable William H. Pryor
February 20, 2017
Page 16

combined with other data,[56] show that encouraging greater use of alternatives to incarceration will likely decrease recidivism rates.

In conclusion, the Commission's own data, combined with other points discussed earlier in these comments about how alternatives to incarceration are retributive and more likely to meet a person's rehabilitative needs and strengthen the communities in which they reside, show that making alternatives to incarceration available for more people will better serve all the purposes of sentencing.

### 2.  No Offenses Should Be Exempt From the Zone Changes

The Commission requests comment on whether it should exempt certain offenses, particularly white collar offenses, from the zone changes. For the same reason that the Commission should not exempt any offense from the presumption of an alternative sentence in §5C1.1, it should not exempt any offense from the zone changes.

### 3.  No Additional Guidance is Needed for New Zone B Defendants

The Commission requests comment on whether it should provide guidance to address the new Zone B defendants who previously fell within Zone C. Defenders believe that such guidance is not necessary at this point. The Commission would do better to study the impact of the amendments and determine if they are having their intended effect of expanding the use of alternatives to incarceration.

### 4.  The Commission Should Include an Invited Departure for Zone D Defendants Convicted of Non-Violent Offenses Such as Drug Trafficking

Persons convicted of drug trafficking often fall within Zone D and are typically given lengthy terms of imprisonment even though they may statutorily qualify for probation or may be given a split sentence. An invited departure from Zone D to Zone B for individuals convicted of nonviolent offenses would promote sentences of probation when permitted by statute and a split sentence when not permitted by statute. FY 2015 data show that only 4% of persons sentenced for drug trafficking had a base offense level of 12 or lower and only 6.5% fell within Zones A, B, or C.[57] At the same time, 54.2% were not subject to a mandatory minimum sentence. Any of those individuals, even if convicted of an offense with a statutory maximum of more than 25 years are statutorily allowed to be sentenced to prison for as little as one day. Because all of the purposes of sentencing could be served by a split sentence or probation for many of these individuals, an invited departure is appropriate.

---

[56] *See* Discussion *supra* Part A (discussing how persons sentenced to community corrections have lower rates of recidivism and U.S. Probation's success in lowering recidivism rate through new methods of supervision).

[57] USSC, *FY2015 Monitoring Dataset*.

Honorable William H. Pryor
February 20, 2017
Page 17

### 5. The Commission Should Maintain the Invited Departure for Treatment in §5C1.1

The Commission's proposed amendment deletes §5C1.1. comment, (n.6) regarding invited departures for individuals with substance abuse disorders and mental illness. This is a critical departure that promotes treatment needs and recognizes that imprisonment can sometimes exacerbate the problems of people with such disorders. It is consistent with "a growing recognition of the importance of treating, rather than punishing, mentally ill defendants and an understanding that prison may not be the appropriate setting for such treatment."[58] Rather than delete the application note, the Commission should amend it to invite a departure from Zone D to Zone B. "Findings show unequivocally that providing comprehensive drug abuse treatment to criminal offenders works, reducing both drug abuse and criminal recidivism."[59] Other studies favor alternatives to incarceration rather than imprisonment.[60]

An invited departure that makes an alternative sentence available would be especially helpful for people who can turn their lives around. Take, for example, a drug courier whose guideline range is high because he carried a large quantity of drugs. He is a drug addict and committed the offense to support his addiction. After being arrested and before sentencing, he participated in a drug treatment program and reunited with his family in a positive way. At the time of sentencing, he is still doing well in the treatment program. A sentence of imprisonment would interrupt treatment and not advance the purposes of sentencing. An invited departure, however, would encourage the court to fashion a sentence that meets treatment needs and promotes public safety.

Alternatives to incarceration for people who suffer from a mental illness, including a co-occurring substance use disorder, also are important. An "estimated 45 percent of federal prisoners . . . have a mental health problem."[61] Incarcerating such individuals often puts a drain on prison resources and the Bureau of Prisons is not equipped to handle the treatment needs for

---

[58] *United States v. Ferguson*, 952 F. Supp. 2d 1186, 1191-92 (M.D. Ala. 2013). *See also United States v. Flowers*, 946 F. Supp. 2d 1295, 1299 (M.D. Ala. 2014).

[59] Nat'l Inst. of Drug Abuse, *Principles of Drug Abuse Treatment for Criminal Justice Populations – A Research Based Guide* 9 (2014).

[60] *See generally Myths & Facts: Why Incarceration Is Not the Best Way to Keep Communities Safe, supra* note 6, at 9 ("By large majorities, victims specially prefer investments in mental health, drug treatment, and supervised probation over incarceration."); Missouri Sent'g Advisory Comm'n, *Probation Works for Nonviolent Offenders*, 1 Smart Sent'g 1 (June 2009) ("[R]ecidivism rates actually are lower when offenders are sentenced to probation, regardless of whether the offenders have prior felony convictions or prior prison incarcerations . . . .").

[61] Urban Institute, *The Processing and Treatment of Mentally Ill Persons in the Criminal Justice System* 8 (2015).

Honorable William H. Pryor
February 20, 2017
Page 18

these individuals.[62] Indeed, being able to provide medical care is one of the biggest challenges facing BOP.[63]

Diverting individuals with mental illness to "community-based mental health treatment programs," including mental health courts, is one way to "alleviate the strain on resources caused by incarcerating the mentally ill and providing treatment for them in prison."[64]

### 6.   The Commission Should Delete Current Note 7 (Proposed Note 5) in §5C1.1

Note 7 in §5C1.1 (proposed note 5) should be deleted because it discourages substitutes of imprisonment for "most defendants with a criminal history category of III or above." That provision makes 57% of Zones A, B, and C meaningless because 33 of the 58 ranges in those zones fall within CH III or above. It also discourages judges from imposing alternatives to incarceration for individuals who could benefit from them, and has an adverse impact on Black individuals in Zones B and C, who tend to fall within higher criminal history categories than other groups.[65] Discouraging alternatives for defendants in higher criminal history categories serves no penological purpose and is based on unsound assumptions. No data supports the notion that defendants in higher criminal history categories would not benefit from an alternative to incarceration because we do not know the nature of the previous sentence imposed on those individuals. If they were sentenced to prison or placed on probation without services that meet their rehabilitative needs, their recidivism is at least as much a product of systemic failure as it is their capacity to "reform."

### 7.   Home Detention – Electronic monitoring

Defenders have no objection to the Commission's proposed changes to the commentary on home detention and the use of electronic monitoring because it acknowledges that several different

---

[62] FY 2016 Agency Financial Report, *supra* note 9, at I-25 ("[C]rowding has a negative impact on the ability of the BOP to promptly provide inmate treatment and training programs that promote effective reentry and reduce recidivism . . . .").

[63] *Id*. at III-12.

[64] *Id*. at 27.

[65] *Alternative Sentencing, supra* note 45, at 16 ("Black offenders [within Zones A through C] had more serious criminal history scores compared to the other groups."). *See also id*. at 20 (attributing different rates of alternative sentences for "Black offenders" on the difference in criminal history among Black, White, Hispanic, and Other offenders).

Honorable William H. Pryor
February 20, 2017
Page 19

location monitoring technologies may be used to verify whether a person is abiding by the conditions of supervision.[66]

## II.   Proposed Amendment #2: Tribal Issues

Defenders commend the Commission for convening the Tribal Issues Advisory Group (TIAG) and for proposing amendments based on some of the recommendations in the TIAG's 2016 Report. In addition to supporting the proposed amendments, Defenders encourage the Commission to consider amendments responsive to the TIAG's recommendation that the guidelines make changes to better address young people who are prosecuted in federal court. Federal jurisdiction over Indian young people presents important issues and is too frequently overlooked.[67] We encourage the Commission to follow the recommendations of TIAG to both amend §5H1.1 (Age), and add a departure to Chapter 5, Part K "concerning juvenile and youthful offenders."[68]

### A.  Tribal Court Convictions

In response to the TIAG's recommendations, the Commission proposes amending the Commentary to §4A1.3 to add a non-exhaustive list of factors courts may consider when deciding "whether, or to what extent, an upward departure based on a tribal court conviction is appropriate." Defenders support the proposed amendment as a good effort to resolve a complicated situation. While we continue to have concerns about the practices in sentencing Native defendants in federal court, at this point, the TIAG recommendation seems like a workable approach.

In response to the Commission's issues for comment about how the proposed factors should interact with one another, Defenders support the TIAG's recommended approach. Due to the complex issues involved in considering tribal convictions for purposes of federal sentencing, including the wide variety of practices among the hundreds of different tribes across the country, we support the TIAG's recommendations that the factors identified in the departure commentary be non-exhaustive, and that no one factor be weighted more heavily than any other.

---

[66] *See generally* Admin. Office of U.S. Courts, Guide to Judiciary Policy, Vol. 8, Federal Location Monitoring Program, Monograph 113 (2016).

[67] *See*, *e.g.*, Barbara Creel, *Tribal Court Convictions and the Federal Sentencing Guidelines: Respect for Tribal Courts and Tribal People in Federal Sentencing*, 46 U.S.F. L. Rev. 37 (2011) ("Historically, the federal juvenile population has been predominantly Native American males. A 2000 study found that seventy-nine percent of all juveniles in federal custody are Native American."); Indian Law & Order Comm'n, *A Roadmap for Making Native America Safer: A Report to the President and Congress of the United States* 157 (Nov. 2013) ("Between 1999-2008, for example, 43-60 percent of juveniles held in Federal custody were American Indian.").

[68] USSC, *Report of the Tribal Issues Advisory Group* ("*TIAG Report*") 1 & 33-34 (May 16, 2016).

Honorable William H. Pryor
February 20, 2017
Page 20

Finally, in response to the request for comment on whether the Commission should amend §4A1.2(i), Defenders emphatically answer, "no." Consistent with the TIAG,[69] Defenders oppose, as we have since the inception of the guidelines, counting tribal convictions in the criminal history calculation.[70]

### B. Court Protection Orders

Also in response to the TIAG's recommendations, the Commission proposes amending §1B1.1 to define "court protection order," to mean "'protection order' as defined by 18 U.S.C. § 2266(5) and consistent with 18 U.S.C. § 2265(b)." Defenders support this proposed amendment. Consistent with the TIAG's recommendation, Defenders urge the Commission not to make any additional changes to the guidelines regarding protection orders. We agree with the TIAG that "[g]iven the absence of reliable data and the real potential for disparate impact on Indian defendants" the Commission should "collect and study the data before considering any expansion of the use of court protection orders as enhancements under Chapters Two or Three."[71]

### III.  Proposed Amendment #3: Youthful Offenders

Defenders fully support the Commission's proposal to exclude prior juvenile adjudications from the criminal history calculation. We also urge the Commission to consider broadening the amendment to exclude all prior offenses committed before the age of 18 from the criminal history calculation, career offender guideline, and other guideline recommended enhancements. If the Commission declines to broaden the scope of the proposed exclusion, Defenders support an invited downward departure for any prior offenses committed before the age of 18.

---

[69] *Id.* at 12 ("The TIAG recommends that tribal convictions not be counted under U.S.S.G. §4A1.2."); Transcript of Public Hearing Before the U.S. Sentencing Comm'n, Washington, D.C., at 28-29 (Judge Lange) ("it was unanimous among the five federal judges [on the TIAG] that [tribal convictions] ought not to be automatically counted"); *id.* at 27 (Judge Erickson) ("amongst the majority there was a concern that if we just said all tribal convictions should score … it would exacerbate the disparity that already exists in Indian country sentencing). *See also* USSC, *Report of the Native American Advisory Group* 13 (Nov. 4, 2003) (declining to recommend counting tribal convictions in the criminal history score and reporting that "discussion among the Ad Hoc Advisory Group members revealed that there was some concern that such an amendment would raise significant constitutional and logistical problems").

[70] *See* Summary of Testimony of Tova Indritz, Federal Public Defender for the District of New Mexico Before the U.S. Sentencing Comm'n, Denver, Colo. 9-10 (Nov. 5, 1986) (urging the Commission not to count tribal court convictions). *See also*, Jon M. Sands & Jane L. McClellan, *Policy Meets Practice: Why Tribal Court Convictions Should Not Be Counted*, 17 Fed. Sent'g Rep. 215 (2005) (opposing the counting of tribal sentences in defendants' criminal history); Creel, *supra* note 67, at 39 (opposing counting tribal court convictions in federal sentencing).

[71] *TIAG Report*, *supra* note 68, at 15.

Honorable William H. Pryor
February 20, 2017
Page 21

### A.  Juvenile Adjudications Should Not Count

Defenders support the proposed amendment to exclude prior juvenile adjudications from the criminal history calculation. We see the injustice of the current rule on a regular basis. We have represented a young woman who was charged as a courier in her first drug offense, but was denied safety valve relief from a mandatory minimum sentence because of a domestic dispute as an adolescent, while she was struggling with mental and emotional issues, that led to a juvenile adjudication. We have represented a man who was pushed across the sentencing grid to criminal history category V on the basis of an adjudication for assault when he was 10-years-old, an adjudication for escape when he walked out of juvenile court at age 15, and a cocaine conviction when he was 18-years-old. And another young man who at age 20 fell in criminal history category V based entirely on juvenile adjudications, mostly for car theft. We routinely see our clients earn criminal history points for minor offenses committed when they were quite young, such as a 14-year-old lying to a police officer about his name and birthdate during a traffic stop.

The guidelines' current rule of counting prior juvenile adjudications creates unwarranted disparity by treating prior juvenile adjudications within the applicable time period[72] on par with adult convictions. Juvenile adjudications should be excluded from the criminal history calculation for many reasons including (1) young people are less culpable than adults; (2) juvenile adjudications are less reliable than adult convictions due to fewer procedural protections; (3) the length of a juvenile disposition is a poor proxy for the seriousness of a prior offense, and is not comparable to the length of a sentence imposed in an adult criminal conviction; and (4) excluding these adjudications may have an ameliorative effect on the disproportionate impact of the criminal history rules on racial minorities.

### 1.  Young People Are Less Culpable

Recently, in a series of opinions, the Supreme Court recognized that "children are constitutionally different from adults in their level of culpability."[73]  That is, "juveniles have diminished culpability."[74] The Court's decisions in this series increasingly rest "not only on

---

[72] The current guidelines provide different decay rules for some—but not all—juvenile adjudications. *See* §4A1.2(d) & (e). These different decay periods are important, but do not adequately address the differences between juvenile adjudications and adult convictions.

[73] *Montgomery v. Louisiana*, 136 S. Ct. 718, 736 (2016) (holding that the Court announced a substantive rule of constitutional law in *Miller v. Alabama*, 132 S. Ct. 2455, 2460 (2012) (holding that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments'")). *See also Graham v. Florida*, 560 U.S. 48, 82 (2010) (holding that the "Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide"); *Roper v. Simmons*, 543 U.S. 551, 578 (2005) (holding that the "Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed").

[74] *Miller*, 132 S. Ct. at 2464.

Honorable William H. Pryor
February 20, 2017
Page 22

common sense—on what any parent knows"—but on "science and social science" including an "ever-growing body of research in developmental psychology and neuroscience."[75] The research shows that "[c]ompared with adults, juveniles are less able to restrain their impulses and exercise self-control; less capable of considering alternative courses of action and avoiding unduly risky behaviors; and less oriented to the future and thus less attentive to the consequences of their often-impulsive actions."[76] It also "demonstrate[s] that 'juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure,' while at the same time they lack the freedom and autonomy that adults possess to escape such pressures."[77] And recent "neuroscience research suggests a possible physiological basis for these recognized developmental characteristics of adolescence."[78] As the Court noted: "It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance."[79]

## 2. Juvenile Adjudications Are Less Reliable than Adult Criminal Convictions

Juvenile courts provide fewer procedural protections than adult criminal courts and, as a result, juvenile adjudications are less reliable. To be clear, Defenders are not weighing in on the issue of whether juvenile adjudications are "sufficiently reliable to allow for [the] therapeutic dispositions," juvenile courts were originally designed to provide.[80] Rather, our point is that they are "not obtained in a sufficiently reliable manner to justify the much harsher consequences of their use as criminal sentence enhancements."[81] It is "fundamentally unfair to provide youths with fewer procedural safeguards in the name of rehabilitation and then use convictions and sentences obtained for treatment purposes to punish them more severely as adults."[82]

---

[75] *Id.* at 2464 & n.5.

[76] Brief for the American Psychological Association, American Psychiatric Association and National Association of Social Workers as *Amici Curiae* in Support of Petitioners at 3-4, *Miller*, 132 S. Ct. 2455 (Nos. 10-9646, 10-9647).

[77] *Id.* at 4.

[78] *Id.*

[79] *Miller*, 132 S. Ct. at 2464 n.5.

[80] Barry Feld, *The Constitutional Tension Between Apprendi and McKeiver: Sentence Enhancements Based on Delinquency Convictions and the Quality of Justice in Juvenile Courts*, 38 Wake Forest L. Rev. 1111, 1190 (2003).

[81] *Id.*

[82] *Id.* at 1194. Professor Feld, a leading juvenile justice scholar, and a proponent—in theory—of using juvenile adjudications (at a discounted level) to enhance adult sentences, acknowledges that doing so

Honorable William H. Pryor
February 20, 2017
Page 23

Over the years, the Supreme Court has recognized and required certain procedural protections attend juvenile adjudications, but a significant gap still exists between the juvenile and adult courts over the procedural safeguards they offer.[83]

### a.  Juvenile Court: Origin and Purpose

The unique origin of the juvenile court system helps explain the gap. "The modern juvenile justice system, which traces its origins to the turn-of-the-century Progressive reform movement, is premised on assumptions and goals that are profoundly different from those of the adult criminal system."[84] The "highest motives and most enlightened impulses led to a peculiar system for juveniles, unknown to our law in any comparable context."[85] "Under the guise of parens patriae, juvenile courts emphasized treatment, supervision, and control rather than punishment, and exercised broad discretion to intervene in the lives of young defendants."[86] In creating this special court, and separating young people from adults, "juvenile courts rejected the jurisprudence and procedure of adult criminal prosecutions."[87] Juvenile court proceedings "focused on the child's background and welfare, rather than the specifics of the crime."[88] From the "inception of the juvenile court system, wide differences have been tolerated—indeed insisted upon—between the procedural rights accorded to adults and those of juveniles."[89]

### b.  No Right to a Jury

Concerned that the juvenile court had failed to deliver on its promise, the Supreme Court gave juveniles certain procedural protections.[90] Subsequently, however, the Court declined to

---

under current conditions "raise[s] troubling issues in light of the quality of procedural justice by which juvenile courts originally obtained those convictions." *Id.* at 1188-90.

[83] *See* Feld, *supra* note 80, at1114.

[84] *United States v. Johnson*, 28 F.3d 151, 158 (D.C. Cir. 1994) (Wald, J., dissenting). *See also* Feld, *supra* note 80, at 1135.

[85] *In re Gault*, 387 U.S. 1, 17 (1967).

[86] Feld, *supra* note 80, at 1138.

[87] *Id.*

[88] *Id*. at 1139.

[89] *Gault*, 387 U.S. at 14.

[90] *Id.* at 33, 36, 55, 56 (recognizing that young people in juvenile courts have a right to counsel, right to notice of charges, privilege against self-incrimination, right to compulsory process, and right to confront and examine adverse witnesses). A few years later, the Supreme Court also recognized that charges against a young person must be proven "beyond a reasonable doubt." *In re Winship*, 397 U.S. 358, 368 (1970).

Honorable William H. Pryor
February 20, 2017
Page 24

recognize a right to a jury trial in juvenile adjudications.[91] Evincing its commitment to the treatment model of the juvenile court, the Court refused to "equate the juvenile proceeding . . . with the criminal trial."[92] While some states provide jury trials for juveniles as a matter of state law, the vast majority do not.[93]

The absence of jury trials for all juveniles "undermines factual accuracy and creates the strong probability that outcomes will differ in delinquency and criminal trials."[94] Research shows that "[a]lthough judges and juries agree in their judgment of defendant's guilt or innocence in about four-fifths of cases, when they differ, juries are far more likely to acquit defendants than are judges given the same types of evidence."[95] "The case law suggests that judges often convict on evidence so scant that only the most closed-minded or misguided juror could think the evidence satisfies the standard of proof beyond a reasonable doubt."[96] And a "comparison of the outcomes of cases in juvenile and adult courts with comparable evidence suggests that it is easier to convict a delinquent in juvenile court than a defendant in criminal court."[97]

The lack of a right to a jury trial is at the heart of one United States Circuit Court of Appeals' decision limiting the use of juvenile adjudications to enhance subsequent adult sentences.[98] Noting the "significant constitutional differences between adult convictions and juvenile adjudications," the Ninth Circuit held that enhancing a sentence beyond the statutory maximum based on "nonjury juvenile adjudications" is inconsistent with the Sixth Amendment as interpreted by the Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466 (2000).[99] While other

---

[91] *McKeiver v. Pennsylvania*, 403 U.S. 528 (1971).

[92] *Id.* at 550. *See also id.* at 545 ("The Court has refrained . . . from taking the easy way with a flat holding that all rights constitutionally assured for the adult accused are to be imposed upon the state juvenile proceeding.").

[93] *See* Nat'l Juvenile Defender Ctr. (NJDC), Juvenile Right to Jury Trial Chart (last rev. July 17, 2014), http://njdc.info/wp-content/uploads/2014/01/Right-to-Jury-Trial-Chart-7-18-14-Final.pdf.

[94] Feld, *supra* note 80, at 1162.

[95] *Id.* at 1162 & n.164 (citing studies); *see also* Richard E. Redding, *Using Juvenile Adjudications for Sentence Enhancement Under the Federal Sentencing Guidelines: Is it Sound Policy?*, 10 Va. J. Soc. Pol'y & L. 231, 241 (2002).

[96] Martin Guggenheim & Randy Hertz, *Reflections on Judges, Juries and Justice: Ensuring the Fairness of Juvenile Delinquency Trials*, 33 Wake Forest L. Rev. 553, 564 (1998).

[97] Feld, *supra* note 80, at 1166-67.

[98] *United States v. Tighe*, 266 F.3d 1187, 1195 (2001) (addressing enhanced sentence pursuant to the Armed Career Criminal Act).

[99] *Id.* at 1192-93, 1195.

Honorable William H. Pryor
February 20, 2017
Page 25

federal courts of appeals have not agreed with the Ninth Circuit,[100] some state courts have reached a similar conclusion,[101] and the Supreme Court has not yet addressed the issue.

### c. Lack of Counsel

Although *Gault* recognized the right to counsel fifty years ago, it "is an open secret in America's justice system that countless children accused of crimes are prosecuted and convicted every year without ever seeing a lawyer."[102] In many jurisdictions this is because "children routinely waive their right to counsel without first consulting with an attorney."[103] Routine waiver is allowed despite real questions as to "whether juveniles possess the competence to waive counsel 'voluntarily and intelligently,' particularly without consulting counsel."[104]

Without a lawyer, young people miss out on critical assistance "protect[ing] [them] from the consequences of false confessions and uncounseled guilty pleas, seek[ing] diversion or case dismissal for their clients," and "limit[ing] exposure to costly and harmful detention."[105]

---

[100] *See*, *e.g.*, *United States v. Smalley*, 294 F.3d 1030 (8th Cir. 2002).

[101] *See Ohio v. Hand*, 2016 WL 4486068, at *8 (Ohio Aug. 25, 2016) (following the Ninth Circuit's reasoning in *Tighe* to hold that, under *Apprendi*, the state cannot treat a prior juvenile adjudication as a prior conviction to enhance the penalty for a subsequent conviction); *State v. Brown*, 879 So. 2d 1276, 1288-90 (La. 2004) (following the Ninth Circuit's reasoning in *Tighe* to hold that, under *Apprendi*, "the use of [juvenile] adjudications to increase the penalty beyond the statutory maximum violates the defendant's Due Process right"); *State v. Harris*, 118 P.3d 236, 245-46 (Or. 2005) (rejecting the Eighth Circuit's rationale in *Smalley* and holding that, when a juvenile adjudication is offered as an enhancement factor to increase a criminal sentence, its existence must either be proved to a trier of fact or be admitted by a defendant for sentencing purposes following an informed and knowing waiver).

[102] NJDC, *Defend Children: A Blueprint for Effective Juvenile Defender Services* 10 (Nov. 2016). *See also* Karol Mason (DOJ, Assistant Attorney General for the Office of Justice Programs) & Lisa Foster (DOJ, Director, Office for Access to Justice), *Guest Post: Some juvenile defendants still denied justice through lack of counsel*, Wash. Post., Dec. 20, 2016 ("[A] half-century after the nation's highest court guaranteed this most basic of rights, youth still encounter obstacles to quality representation. . . . Many young people in detention facilities never had a lawyer appointed to represent them, and too often children are encouraged to waive their right to counsel even when doing so can hurt their chances of a fair hearing and a fair result."); Feld, *supra* note 80, at 1170, 1173 ("Studies in many states consistently report that juvenile courts adjudicate youths delinquent without the appointment of counsel." In addition, "[m]any juveniles commonly appear without lawyers because juvenile court judges find that they waived their right to counsel.").

[103] NJDC, *supra* note 102, at 10. *See also* Feld, *supra* note 80, at 1174; Redding, *supra* note 95, at 247.

[104] Feld, *supra* note 80, at 1175. *See also* Redding, *supra* note 95, at 248.

[105] NJDC, *supra* note 102, at 15.

Honorable William H. Pryor
February 20, 2017
Page 26

Even when lawyers are physically present, problems often exist with the quality of the representation provided young people. "Throughout the United States, juvenile defenders are overworked and underpaid, and may lack the training and resources critical to their success."[106] Quality representation in juvenile court requires specialized knowledge and skills.[107] For example, juvenile defenders "must have knowledge of delinquency laws and procedures; be versed in adolescent development and the evolving juvenile-specific jurisprudence; be competent to effectively counsel youth on making critical legal decisions; [and] be able to convey complex legal principles to their young clients and families."[108] Despite this need for specialized skills, "many states report non-existent or inadequate training for juvenile defenders."[109]

In addition, young people "are less likely than adults to work effectively with their lawyers to aid in their defense."[110] The Supreme Court explained: "Difficulty in weighing long-term consequences; a corresponding impulsiveness; and reluctance to trust defense counsel, seen as part of the adult world a rebellious youth rejects, all can lead to poor decisions by one charged with a juvenile offense. These factors are likely to impair the quality of a juvenile defendant's representation."[111]

### d.  Other Procedural Weaknesses Reduce the Reliability of Juvenile Adjudications

In addition to no guarantee of a jury, and the frequent absence of quality counsel, juvenile courts "often follow evidentiary and procedural rules less rigorously."[112] The courts may "enter an adjudication of delinquency hastily without ensuring that juveniles' rights are protected, or without sufficient evidence to prove guilt beyond a reasonable doubt, particularly in cases where a delinquency adjudication is the only way to ensure that the juvenile receives needed mental health or social services."[113]

---

[106] Mason & Foster, *supra* note 102.

[107] NJDC, *supra* note 102, at 27.

[108] *Id.*

[109] *Id.*

[110] *Graham,* 560 U.S. at 78.

[111] *Id.* (citations omitted).

[112] Redding, *supra* note 95, at 243.

[113] *Id.* at 244.

Honorable William H. Pryor
February 20, 2017
Page 27

The rate of juvenile appeals also is low. One study showed that "only 1 in every 2,707 juvenile cases is appealed every year."[114] By comparison, a comprehensive review of federal appeals showed that 16% of federal convictions were appealed.[115] At the state level, while little data is available, "estimates are higher."[116]

### 3. The Length of a Juvenile "Sentence" Is a Poor Proxy for the Seriousness of the Offense, and Not Comparable to the Length of Sentence Imposed for an Adult Criminal Conviction

Under the current guidelines, the length of a juvenile "sentence" is used as a proxy for the seriousness of a prior offense, and other than a different decay period for certain juvenile adjudications, is treated the same as an adult prior conviction with the same sentence imposed.[117] But a juvenile disposition is a poor proxy for the seriousness of a prior offense, and is not comparable to the length of a sentence imposed in an adult criminal conviction.

Today's "juvenile justice system still maintains rehabilitation as its primary goal."[118] This means that juvenile court dispositions "typically include a treatment plan aimed at addressing perceived deficiencies in the child's current living environment and behavior."[119] No relationship necessarily exists between the "offense" and the "sentence" or disposition imposed by the juvenile court.[120] The "imposition and duration of juvenile confinement may be set irrespective of proportionality; irrespective of the sentence ranges for adult offenders."[121] A disposition of confinement "may simply mean that the juvenile lacked an adequate home or that the community lacked adequate services."[122] In other words, the duration of a juvenile disposition is a particularly poor proxy for the seriousness of a prior juvenile adjudication. And critically, it is not at all comparable to the length of sentence imposed for an adult criminal conviction.

---

[114] NJDC, *Increasing Juvenile Appeals: An Underused Critical Check on the Juvenile Delinquency System* (Sept. 2016), http://njdc.info/wp-content/uploads/2016/10/Increasing-Juvenile-Appeals.pdf.

[115] U.S. Dep't of Justice, Bureau of Justice Statistics, *Federal Criminal Appeals, 1999 with Trends 1985-99* (2001).

[116] Megan Annitto, *Juvenile Justice on Appeal*, 66 U. Miami L. Rev. 671, 680 (2012).

[117] *See* §4A1.2(d).

[118] Juvenile Law Center, *Youth in the Justice System: An Overview*, http://jlc.org/news-room/media-resources/youth-justice-system-overview.

[119] NJDC, *Juvenile Court Terminology*, http://njdc.info/juvenile-court-terminology/.

[120] Redding, *supra* note 95, at 245.

[121] *Johnson*, 28 F.3d at 293 (Wald, J., dissenting).

[122] *Id.*

Honorable William H. Pryor
February 20, 2017
Page 28

### 4.   Excluding Prior Juvenile Adjudications May Ameliorate the Disparate Impact of the Criminal History Rules on Racial Minorities

The Commission's proposal to exclude juvenile adjudications from the criminal history calculation may have an ameliorative effect on the current disproportionate impact of the criminal history rules on racial minorities.[123] Evidence indicates that "youth of color—and especially black youth—experience disproportionate court involvement and are more likely to receive harsher punishment."[124] An examination of data from 2013 shows that "black youth comprised 16% of the youth population" but "35% of all delinquency cases handled by the juvenile courts and were more than twice as likely to be referred to juvenile court as white youth."[125] The disproportionality becomes "more pronounced and has more serious consequences" as young people proceed through the system.[126] Specifically, in 2013, "the rate at which referred cases were formally processed was 20% greater for black youth than for white. . . . Additionally, the rate at which black youth were ordered into residential placement after adjudication was 20% greater than for white youth, while white youth were more likely to receive a disposition of probation."[127] Data from earlier years show similar trends. In 2010, for example, "cases involving black (59%) or American Indian (60%) youth were more likely to be formally processed (i.e., petitioned) than cases involving Asian (57%) or white (50%) youth."[128] And, "[a]cross most offenses, adjudicated cases involving black youth were more likely to result in a disposition of out-of-home placement than cases involving youth of other races."[129]

---

[123] Scholars from the Robina Institute of Criminal Law and Criminal Justice at the University of Minnesota urge each sentencing commission to "examine the racial impact of its criminal history score and all score components" and "[i]f a particular component is found to have a strong disparate impact on nonwhite offenders, the commission should carefully evaluate the rationales for including that component to ensure that the degree of added enhancement is narrowly tailored to meet the chosen goals without unnecessary severity and disparate impact." Richard S. Frase et al., Robina Institute of Criminal Law & Criminal Justice, *Criminal History Enhancements Sourcebook* 116 (2015). The scholars also note that reducing or eliminating "criminal history rules that have a disparate impact on nonwhite offenders" is the "fastest and least expensive" way to reduce "perceived unfairness" and "other, more concrete beneficial effects" such as less crime. *Id.* at 107.

[124] Katherine Hunt Federle, *The Right to Redemption: Juvenile Dispositions and Sentences*, 77 La. L. Rev. 47, 52 (Fall 2016).

[125] *Id.* at 51.

[126] *Id.* at 52.

[127] *Id.*

[128] National Center for Juvenile Justice (NCJJ), *Juvenile Offenders and Victims: 2014 National Report* 172 (Dec. 2014).

[129] *Id.*

Honorable William H. Pryor
February 20, 2017
Page 29

Counting juvenile adjudications pushes people into higher criminal history scores and precludes individuals from qualifying for safety valve relief. Black defendants are disproportionately impacted in both of these areas. In 2015, black defendants comprised 20.5 percent of all defendants, but 34 percent of defendants in the top three criminal history categories.[130] In addition, black defendants qualify for the safety valve far less often than any other group, primarily because of criminal history.[131]

### B. No Conviction for Conduct Committed Before Age 18 Should Enhance Guideline Recommended Sentences

Even better than excluding juvenile adjudications from the criminal history calculation, would be excluding all offenses committed before the age of 18, regardless of whether they resulted in adjudications in juvenile court or convictions in adult court. Defenders recommend that these prior offenses be excluded from all guideline enhancements.[132] This is consistent with the evidence that young people are less culpable than adults, and, indeed, as the Supreme Court has recognized, "are constitutionally different from adults in their level of culpability."[133] In addition, and critically, it avoids the unwarranted disparity generated by relying on state policies and practices—that vary tremendously, and shift regularly—regarding the adult criminal prosecution of young people for offenses committed before age 18.

Having addressed, above, the reduced culpability of young people, here we focus on the many different state practices and procedures that would generate unwarranted disparity if the Commission draws a line between juvenile and adult priors, rather than simply excluding all prior offenses committed before age 18. We have witnessed the unwarranted disparity that comes from guidelines that ignore the vastly different and ever-changing state-defined jurisdictional boundaries of juvenile court, and its exceptions. For example, in one Defender case, a defendant who committed a note job bank robbery at the age of 19 was sentenced as a career offender based on two prior convictions for struggles with police that occurred when he was 17. The

---

[130] *See* USSC, Individual Offender Datafiles 2015.

[131] *See* USSC, *Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* ("*Mandatory Minimum Report*"), xxviii, 354 (2011).

[132] Currently, the guidelines recommend offenses committed before age 18 enhance sentences in multiple ways. *See* §4A1.1(d); §4B1.2, comment. (n.1) (defining "prior felony conviction" to include "[a] conviction for an offense committed prior to age eighteen . . . if it is classified as an adult conviction under the laws of the jurisdiction in which the defendant was convicted"); §2K1.3, comment. (n.2) (same language in definition of "felony conviction"); §2K2.1, comment. (n.1) (same); §2L1.2, comment. (n.1(B)) (indicating that offenses committed before 18 are to be counted toward enhancements if the conviction was "classified as an adult conviction under the laws of the jurisdiction in which the defendant was convicted").

[133] *Montgomery*, 136 S. Ct. at 736. *See also* discussion *supra* pp. 21-22.

Honorable William H. Pryor
February 20, 2017
Page 30

priors counted as career offender predicates because at that time, all 17-year-olds were treated as adults in Massachusetts. If the offenses had occurred in neighboring Rhode Island, where the juvenile court has original jurisdiction over all young people under the age of 18, the defendant likely would not have qualified as a career offender. Indeed, if it simply had happened a few years later, after Massachusetts increased the jurisdiction of its juvenile courts to all young people under the age of 18, it is likely he would not have been deemed a career offender.

In addition to reviewing our comments below, we urge the Commission to visit the website, Juvenile Justice: Geography, Policy, Practice & Statistics.[134] This site has a page regarding the jurisdictional boundaries of juvenile courts and adult criminal courts for young people in all 50 states and the District of Columbia.[135] It provides interactive maps of the United States showing which, and how many, states follow the many different policies and practices that interact to determine whether a particular young person who commits an offense is adjudicated in juvenile court, or convicted in adult criminal court.[136] The site also shows how the policies and practices of the various states have changed over the years, and provides detailed information on each state.[137]

### 1.   Different Age Boundaries for Juvenile Court

States differ on the age at which they set the upper boundary of juvenile court. While the vast majority of states currently include all individuals under the age of 18, several states limit the jurisdiction of the juvenile court to those who are 16 or younger, and two states, New York and North Carolina, limit the jurisdiction of juvenile court to those who are 15 and younger.[138] These age-based boundaries have changed over time, and likely will continue to do so.[139] For example, just a few years ago, in 2010, 11 states capped juvenile court jurisdiction at 16 years old.[140] By

---

[134] Juvenile Justice: Geography, Policy, Practice & Statistics (JJGPS), http://www.jjgps.org/.

[135] JJGPS, jurisdictional boundaries, http://www.jjgps.org/jurisdictional-boundaries.

[136] *Id.*

[137] *Id.*

[138] *Id.* at Delinquency age boundaries; NCJJ, *supra* note 128, at 93.

[139] *See* JJGPS, *supra* note 135.

[140] *See* NCJJ, *supra* note 128, at 93.

Honorable William H. Pryor
February 20, 2017
Page 31

2015, four of those states had increased the maximum age to 17.[141] And in 2016, two additional states followed suit.[142]

## 2. Exceptions to Juvenile Court

"All states have statutes that make exceptions to the age boundaries of delinquency by specifying when the offense of a juvenile may or must be considered the crime of an adult."[143] But who decides which young person should be excepted from juvenile jurisdiction, and how, varies dramatically from state to state.[144] In addition, any given state may have multiple decision-makers, policies and practices. A chart demonstrating the numerous ways each state exempts juveniles from juvenile court for prosecution in adult criminal courts is attached as Appendix B.[145]

### a. Judicial Waiver

Many states have provisions that give juvenile court judges the authority to transfer a young person to adult criminal court.[146] Often, this decision is discretionary. But some states also, or instead, provide for presumptive and/or mandatory waiver.[147] Presumptive waiver provisions set forth conditions for transfer to adult court, but allow the young person to argue for retention in juvenile court.[148] Mandatory waiver provisions require a juvenile court judge to transfer a young person to adult court if the judge determines certain conditions have been met.[149]

### b. Statutory Exclusion

Legislatures in many states also play a role in deciding whether a young person will be retained in juvenile court or transferred to adult criminal court. This sometimes is referred to as "statutory

---

[141] *See* JJGPS, *supra* note 135.

[142] Rich Williams, Nat'l Conf. of St. Legislatures, *South Carolina Raises the Age of Juvenile Court Jurisdiction, Louisiana to Follow* (June 7, 2016), http://www.ncsl.org/blog/2016/06/07/south-carolina-raises-the-age-of-juvenile-court-jurisdiction-louisiana-to-follow.aspx; Louisiana Ctr. for Children's Rights, *Raise the Age LA Becomes Law* (June 14, 2016), http://www.laccr.org/news/raise-the-age-la-becomes-law/.

[143] JJGPS, *supra* note 135, at Transfer discretion; *see also* NCJJ, *supra* note 128, at 99.

[144] *Id.*

[145] Attached as Appendix B is a copy of a table from NCJJ, *supra* note 128, at 100.

[146] NCJJ, *supra* note 128, at 99.

[147] *See* Appendix B; JJGPS, *supra* note 135, at Transfer discretion.

[148] JJGPS, *supra* note 135, at Transfer discretion.

[149] *Id.*

Honorable William H. Pryor
February 20, 2017
Page 32

exclusion."[150] These provisions may provide for adult jurisdiction based on factors such as age, history, and the nature of the offense.[151] Statutes may also exclude young people from juvenile court jurisdiction because they are married or otherwise emancipated.[152]

Most states also have legislative transfer provisions commonly referred to as "once an adult, always an adult."[153] Under these policies, once a juvenile has been tried for one offense in adult criminal court, any subsequent offense must also be prosecuted in adult criminal court.[154]

### c.   Direct File—Prosecutorial Power to File Charges in Adult Court

In some states, the decision of whether a young person's conduct will be addressed in juvenile court or adult criminal court rests with the prosecutor.[155] This is sometimes referred to as "direct file."[156] The direct file practice—that is, leaving the jurisdictional decision in the hands of the prosecutor—has been the subject of some scrutiny and criticism. For example, a recent Human Rights Watch study of Florida's policies and practices concluded that "[w]hether a particular youth accused of a particular crime in Florida ends up in adult court is in an important sense arbitrary."[157] Almost all (98.3 percent in 2012-13) of "juvenile cases transferred to adult court in Florida in recent years ended up there pursuant to the state's direct file statute [that] . . . gives unfettered discretion to charge 16- and 17-year-olds accused of any felony in adult court and to charge 14- and 15-year-olds as adults with respect to certain specific felonies."[158] The report noted that "more than 60 percent of the juveniles Florida transferred to adult court during this period were charged with nonviolent felonies."[159]

---

[150] NJCC, *supra* note 128, at 99.

[151] JJGPS, *supra* note 135, at Transfer discretion.

[152] NJCC, *supra* note 128, at 93; s*ee also* Office of Juvenile Justice and Delinquency Prevention, *Statistical Briefing Book* (including chart on Juvenile Emancipation, 2011), https://www.ojjdp.gov/ojstatbb/structure_process/qa04126.asp?qaDate=2011.

[153] NJCC*, supra* note 128, at 99.

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] Human Rights Watch, *Branded for Life: Florida's Prosecution of Children as Adults under its "Direct File" Statute* 1 (2014).

[158] *Id.* at 3.

[159] *Id.* at 1.

Honorable William H. Pryor
February 20, 2017
Page 33

### d.  Reverse Waiver

Transfer is not always a one-way street. Several states provide for an adult criminal court to transfer jurisdiction to the juvenile court.[160] This is sometimes referred to as "reverse waiver."[161] The criteria a court considers "usually mirror what the juvenile court judge must consider for transfer to criminal court."[162] To complicate matters even more, in some states, "transfer cases resulting in conviction in criminal court may be reversed to juvenile court for disposition."[163]

### e.  Juvenile Court Blended Sentence

In states with juvenile court blended sentences, juvenile courts are authorized to impose "adult criminal sanctions on certain juvenile offenders."[164] Often this means the juvenile court may "combine a juvenile disposition with a criminal sentence that is suspended. If the youth successfully completes the juvenile disposition and does not commit a new offense, the criminal sanction is not imposed."[165] Sometimes states "mandate a 're-determination' hearing at the age of majority or other intervals to determine whether adult sanctions are (still) necessary."[166]

### f.  Criminal Court Blended Sentence

Not to be confused with the juvenile court blended sentence, in some states, adult criminal courts are authorized to "impose sanctions otherwise available only to offenders handled in juvenile court."[167] This approach "often involves a suspended adult criminal sentence of incarceration pending successful completion of juvenile sanctions."[168]

---

[160] NCJJ, *supra* note 128, at 99.

[161] *Id.*

[162] JJGPS, *supra* note 135, at Transfer provision detail, http://www.jjgps.org/about/jurisdictional-boundaries#provisiondetails.

[163] NCJJ, *supra* note 128, at 99.

[164] *Id.*

[165] *Id.*

[166] JJGPS, *supra* note 135, at Transfer provision detail, http://www.jjgps.org/about/jurisdictional-boundaries#provisiondetails.

[167] NCJJ, *supra* note 128, at 99.

[168] JJGPS, *supra* note 135, at Transfer provision detail, http://www.jjgps.org/about/jurisdictional-boundaries#provisiondetails.

Honorable William H. Pryor
February 20, 2017
Page 34

### 3. Excluding All Prior Offenses Committed Before the Age of 18 May Ameliorate the Disproportionate Impact of the Criminal History Rules on Racial Minorities.

As with juvenile adjudications, excluding all prior offenses committed before the age of 18 from Chapter 4 calculations may have an ameliorative effect on the current disproportionate impact of the criminal history rules on racial minorities. Looking first at judicial waiver, the evidence shows that "black and American-Indian youth were . . . more likely to be waived to criminal court for trial than white youth."[169]

As the discussion above reveals, however, judicial waiver is just one of the many methods states use to exclude certain young people from juvenile court jurisdiction. Unfortunately, no "national data set exists regarding the number of juveniles transferred to criminal court to stand trial through other waiver mechanisms."[170] Data available from some states, however, indicates "disproportionality . . . remains a hallmark of non-judicial waiver."[171] For example, "[a]lthough black youth comprise only 18% of the youth population in Michigan, they account for 59% of all youth tried as adults."[172] Similarly, in Florida, "although black children constitute only 27.2% of all arrested youth, they comprise 51.4% of all cases transferred to criminal court, and white youth account for 28% of all arrests but only 24.4% of transfers."[173]

Including prior sentences from offenses committed before age 18 pushes defendants into higher criminal history categories, can trigger career offender status, and preclude safety valve relief. As mentioned above, black defendants are disproportionately represented in the top three criminal history categories and disproportionately excluded from safety valve relief because of criminal history. In addition, black defendants are disproportionately represented in the career offender guideline. In 2015, black defendants comprised 20.5 percent of all defendants, but 56.7 percent of defendants sentenced under the career offender guideline.[174]

---

[169] Federle, *supra* note 124, at 52-53 (looking at data from 2013); *see also id.* at 53 ("the rate at which cases involving black youth were transferred was 30% greater than for cases involving white youth"); NCJJ, *supra* note 128, at 174 ("For most of the period from 1985 to 2010, the likelihood of waiver was greater for black youth than for white youth, regardless of offense category.").

[170] Federle, *supra* note 124, at 54.

[171] *Id.* at 57.

[172] *Id.* at 57-58.

[173] *Id.* at 58.

[174] *See* USSC, Individual Offender Datafiles 2015.

Honorable William H. Pryor
February 20, 2017
Page 35

### C.  Invited Downward Departure

The Commission proposes an invited downward departure where:

> The defendant had an adult conviction for an offense committed prior to age eighteen counted in the criminal history score that would have been classified as a juvenile adjudication (and therefore not counted) if the laws of the jurisdiction in which the defendant was convicted did not categorically consider offenders below the age of eighteen years as "adults."

If the Commission declines to exclude all prior offenses committed before the age of 18, an invited departure is a step in the right direction. The departure, however, should be for all priors where the offense was committed before the age of 18. The limitation on the departure the Commission proposes is unnecessarily complicated, would invite litigation, generate unwarranted disparity, and lead to unjust results.

The proposed limitation on the departure is unduly complicated. It would require parties and the court to determine whether a convicting jurisdiction "categorically" excluded the defendant from juvenile court. That is no easy task. It would be difficult to determine what "categorically" means in light of the wide variety of policies and practices states use to both set the jurisdictional boundaries and except young people from them. Some of the many questions generated by the Commission's proposed limitation include:

- Does the "categorical" requirement mean that the departure is limited to defendants with priors committed in jurisdictions where the upper age boundary of juvenile court is set at something less than 17?

- Is the departure also available to defendants with prior offenses in states that set the upper age boundary at 17, but exclude certain categories of young people, such as those who are 15 or 16 years old and committed certain person offenses?[175]

- Is the departure available in jurisdictions that exclude some categories of young people under the age of 18, but that also provide for reverse waiver proceedings where the adult criminal court has discretion to transfer the case back to juvenile court?

- What about criminal court blended sentences, where the young person may be excluded by statute from juvenile court jurisdiction, but the adult court imposes juvenile court sanctions?

---

[175] *See*, e.g., NJCC, *supra* note 128, at 103 (table listing states with statutory exclusion provisions, and identifying minimum age and offense requirements for exclusion).

Honorable William H. Pryor
February 20, 2017
Page 36

In addition to determining what "categorical" means in light of the various state practices, because states change their policies and practices,[176] the parties and the court will also face the challenge of determining whether any given policy or practice was in place at the time of the prior offense.

The proposed limitation also would generate unwarranted disparity and lead to unjust results. It is unclear why a defendant who previously committed an offense while under the age of 18 is less worthy of a departure simply because of the laws in place—at that time—in the particular jurisdiction where he happened to be convicted. We find it difficult to understand why, for example, a defendant who committed an offense before the age of 18 in Florida, or one of the other direct file states, should be excluded from departure consideration simply because of a discretionary decision by a single prosecutor.

Our concerns about unwarranted disparity and unjust results are not alleviated in situations where a judge is involved in transferring jurisdiction. First, the presence of a judicial decision-maker does not guarantee the transfer decision involves a true individualized assessment. Several jurisdictions have mandatory waiver policies under which young people must be excluded from juvenile court if the judge finds certain conditions have been met. Second, even when a judge makes an individualized transfer decision, the Supreme Court has cautioned that "the discretion available to a judge at the transfer stage cannot substitute for discretion at post-trial sentencing in adult court."[177] As the Court explained in *Miller*, "the decisionmaker typically will have only partial information at this early, pretrial stage about either the child or the circumstances of his offense."[178] And, "still more important, the question at transfer hearings may differ dramatically from the issue at a post-trial sentencing."[179]

Finally, limiting the departure as the Commission proposes would have the odd effect of excluding defendants who at the time of their prior offense were very young. In some jurisdictions, the lower age for statutory exclusion is 15 or 16, but judges may transfer much younger children.[180]

---

[176] *See*, *e.g.*, JJGPS, *supra* note 135, (showing state policies over time); Kim Geiger, *Rauner signs law ending automatic transfer of some juveniles to adult court*, Chi. Trib., Aug. 4, 2015 (reporting on new legislation that "eliminates the automatic transfer to adult court of 15-year-olds accused of any crime").

[177] *Miller*, 132 S. Ct. at 2475.

[178] *Id.* at 2474.

[179] *Id.* at 2475.

[180] *See*, *e.g.*, NCJJ, *supra* note 128, at 101, 103 (providing tables showing minimum ages for judicial waiver and statutory exclusion in various states).

Honorable William H. Pryor
February 20, 2017
Page 37

### D.  Clarification Regarding Applicable Time Period

If the Commission amends the guidelines as proposed, Defenders ask the Commission to consider clarifying in §4A1.2(d) the applicable decay period for prior offenses committed prior to age eighteen where the defendant was convicted as an adult and received a sentence of imprisonment exceeding one year and one month. The proposed changes to note 7 in the §4A1.2 commentary indicate that subsection (d) of §4A1.2 "sets forth the time period in which such prior adult sentences are counted." Subsection (d), however, does not address the applicable time period in cases where the sentence of imprisonment exceeded one year and one month. Subsection (d) addresses the applicable time period for similar cases involving confinement of at least sixty days, and other adult sentences. If the note indicates, as proposed, that subsection (d) specifies the applicable time period, we recommend it do so for all three types of prior sentences addressed there.

## IV.    Proposed Amendment #4: Criminal History Issues

Defenders applaud the Commission for proposing important changes to the criminal history rules that, if adopted, will greatly simplify the criminal history calculation and result in the guidelines recommending more just sentences.

### A.  Revocations Should Not Count

Defenders support the Commission's proposal to simplify the criminal history rules by amending §4A1.2(k) to provide that revocations of probation, parole, supervised release, special parole, or mandatory release are not counted for purposes of calculating criminal history points and do not affect the applicable time period for counting prior sentences. The current rule of counting revocations, with special rules regarding how the revocation sentences affect the applicable time period, are unnecessarily complicated and too often lead to unduly severe recommended sentences.

#### 1.  The Current Rule is Complicated with Unjust Effects

The current rule, requiring examination not only of criminal convictions, but also of subsequent revocations is unnecessarily complicated.[181] It requires determining whether various actions in different state courts constitute revocations,[182] and linking the revocation to the original

---

[181] *See*, *e.g.*, USSC, *Simplification Draft Paper: Criminal History*, 9 Fed. Sent'g Rep. 216, 222 (1997) (noting that the area involving revocations "alone has created a substantial degree of complexity in Chapter Four").

[182] *See*, *e.g.*, *United States v. Ramirez*, 347 F.3d 792 (2003) (addressing whether a temporary detention ordered by a youth offender parole board was a constructive revocation under §4A1.2(k)); *United States v. Glover*, 154 F.3d 1291, 1293 (11th Cir. 1998) (addressing whether a state court "Order of Modification of Probation" that imposed 90 days in jail as a condition of probation was a revocation under §4A1.2(k)).

Honorable William H. Pryor
February 20, 2017
Page 38

conviction and sentence to determine whether the revocation affects the decay period for the original conviction, with different rules depending on the nature of the original sentence.[183]

The current rule also can have a devastating and unjust impact on defendants in a number of different ways, including (a) deeming defendants "career offenders" on the basis of old convictions that would not have otherwise counted; (b) rendering defendants ineligible for safety valve relief; and (c) elevating the criminal history category based on very old convictions. For example, in a 2013 methamphetamine case in the Northern District of Iowa,[184] the defendant was a "career offender" based on prior drug cases, one of which was so old it counted only because of the revocation rules. Specifically, in 1993, the defendant sustained a drug conviction in Arizona and was sentenced to four months in jail and probation. Subsequently, in 1997, the defendant was convicted in Iowa for possession with intent to distribute methamphetamine and marijuana. The defendant was released in 1999, and in 2001 while finishing parole in Iowa, decided to return to Arizona to address his violation there, based on his 1997 conviction while on probation for his 1993 conviction. Because the defendant had served time in Iowa and was doing well on parole, the probation officer in Arizona did not recommend probation be revoked. However, in 2001, the Arizona court revoked probation. The 2001 revocation brought the 1993 conviction into the applicable time period under the revocation rules in §4A1.2(k), and transformed the old 1993 drug conviction into a career offender predicate. Deemed a career offender, the guidelines recommended criminal history category VI, an offense level of 34, and a range of 262-327 months. Without the revocation rule resuscitating the old 1993 drug conviction, the guidelines would have recommended criminal history category III, with an offense level of 31, and a range of 135-168 months. Fortunately for this defendant, the Court varied downward from the career offender range and imposed a sentence of 138 months.

Defendants also have been denied safety valve relief from mandatory minimums because the current rule of counting revocations has resulted in them having more than one criminal history point.[185] In *United States v. Rodriguez*, 171 F. App'x 698 (9th Cir. 2006), for example, the

---

[183] §4A1.2(k)(2) (specifying decay period to be measured from date of last release from incarceration for adult term of imprisonment totaling more than one year and one month, from date of last release from confinement for any other confinement sentence for an offense committed prior to defendant's eighteenth birthday, but from date of original sentence in any other case).

[184] *United States v. Asche*, CR 13-3040-MWB (N.D. Iowa. 2013).

[185] 18 U.S.C. § 3553(f) (setting forth requirements for safety valve relief, including that defendant have no more than one criminal history point).

Honorable William H. Pryor
February 20, 2017
Page 39

defendant was denied safety valve relief because he received two criminal history points for a revocation related to a conviction for driving under the influence.[186]

The current revocation rule also can have an unfair impact in routine guideline cases. For example, in a recent felon in possession of a firearm case in the Northern District of California,[187] revocations resuscitated two old felony convictions from the 1990s—both of which had original custodial terms of less than one year—adding 6 points, and moving the defendant from criminal history category IV to VI. Fortunately for this defendant, based on a finding that the criminal history was overstated, the Court departed to criminal history category IV.

## 2.   Not Counting Revocations Is the Better Rule

Many reasons support excluding revocation sentences from the criminal history calculation. First, because revocations are not necessarily criminal in nature, they should not be included in determining a defendant's appropriate place on the horizontal axis of the sentencing table, which recommends graduated penalties on the basis of "criminal" history.[188] In many jurisdictions, more than half of revocations are for technical violations, rather than new criminal conduct.[189] Revocations for technical violations such as "failed drug tests, failure to report, failure to meet financial obligations"[190] or failing to "observ[e] a curfew"[191] are not part of a person's "criminal" history.[192]

---

[186] *See also United States v. Hernandez-Castro*, 473 F.3d 1004, 1008 (9th Cir. 2007) (reaffirming holding that "district courts have no authority to adjust criminal history points for the purpose of determining eligibility for safety valve relief under 18 U.S.C. § 3553(f)(1), even when the sentencing court concludes that the criminal history calculation overstates the severity of the prior crimes").

[187] *United States v. Clifton*, CR 15-479-CRB (N.D. Cal. 2015).

[188] *See* USSG Ch. 4, Pt. A, intro. comment. (explaining that "a defendant with a record of prior **criminal** behavior is more culpable than a first offender" and "[g]eneral deterrence . . . dictates that a clear message be sent to society that repeated **criminal** behavior will aggravate the need for punishment with each occurrence") (emphasis added).

[189] *See* Ronald P. Corbett, Jr., *Probation and Mass Incarceration: The Ironies of Correctional Practice*, 28 Fed. Sent'g Rep. 278, 279-80 (Apr. 2016); Urban Inst., *The Justice Reinvestment Initiative: Experiences from the States* 2 (July 2013) ("A substantial portion of revocations—sometimes greater than half—are technical violations rather than new crimes."); The Pew Center on the States, *When Offenders Break the Rules* 3 (Nov. 2007) ("A significant number of returns, however, are solely for violations of the conditions of probation or parole . . . . In some states, these so-called 'technical' or 'condition' violators account for more than half of all those returned to prison."); The Pew Center on the States, *State of Recidivism: The Revolving Door of America's Prisons* 13 & Ex. 2 (Apr. 2011) (across 33 states "19.9 percent of all released offenders were reincarcerated for a new crime" whereas "25.5 percent were returned for a technical violation").

[190] *See* Corbett, *supra* note 189, at 279.

Honorable William H. Pryor
February 20, 2017
Page 40

Second, aggregating revocations with the original sentence artificially inflates the severity of a prior conviction. Chapter Four uses the sentence imposed as a proxy for the seriousness of a prior conviction.[193] The revocation rules, however, are inconsistent with that approach. Revocations are based on post-conviction conduct and do not reflect the seriousness of the prior conviction. If the Commission is going to persist in using the sentence imposed as a proxy for the seriousness of a prior conviction, it is inappropriate to include penalties for conduct that post-dates the sentence imposed for that conviction.

Third, relying on revocations in the criminal history score exacerbates unwarranted disparity because revocation practices and rates vary widely between jurisdictions.[194] As one scholar has noted, "methods of sanctioning [violations] vary as much as the conditions themselves and depend heavily on the discretionary decisions of multiple actors within the criminal justice system."[195] Violations may be handled informally at the "street-level" by community corrections officers.[196] Decisions at this level are often made by "officers without the guidance of formal law or policy."[197] Options for more formal sanctions "will vary according to the policies and procedures of the local jurisdiction."[198] Often "agents will have wide authority to take actions

---

[191] *Id.* at 280.

[192] These technical violations also affect the counting of juvenile adjudications under the current guidelines. Recent data indicate 22% of juveniles who are detained for a probation violation are there for a technical violation. NJDC, Infographic, *Promoting Positive Development: The Critical Need to Reform Youth Probation Orders* (Sept. 2016), http://njdc.info/wp-content/uploads/2016/10/Promoting-Positive-Development-Infographic.pdf.

[193] *See* USSC, *Simplification Draft Paper supra* note 181, at 221 ("The Commission reasoned that basing the criminal history score on the prior sentence length reflects a judicial assessment of seriousness and scope of the underlying criminal conduct.").

[194] *See*, *e.g.*, Pew, *When Offenders Break the Rules*, *supra* note 189, at 4 ("different policies and practices result in radically different rates at which violators are returned to prison"). In addition, length of sentence imposed is a poor proxy for the seriousness of revocations. For example, in Massachusetts, "[w]hether it is a desirable rule or not, when probation is revoked, the original suspended sentence must be imposed, if the time has expired within which the sentence may be revised or revoked . . . . [I]f the suspension of a sentence is revoked, 'the sentence shall be in full force and effect.'" *Com. v. Holmgren*, 421 Mass. 224, 228, 656 N.E.2d 577, 579 (1995).

[195] Cecelia Klingele, *Rethinking the Use of Community Supervision,* 103 J. Crim. L. & Criminology 1015, 1038 (2013).

[196] *Id.*

[197] *Id.* at 1039

[198] *Id.*

Honorable William H. Pryor
February 20, 2017
Page 41

ranging from recounseling the offender on his obligations to initiating revocation proceedings."[199]

Finally, excluding revocation sentences from the criminal history calculation may ameliorate the disproportionate impact of the criminal history rules on racial minorities.[200] "Studies of state revocation practices have found that individuals of color are in some instances more likely to be revoked from community supervision than are their white counterparts for identical violations."[201] Counting revocations pushes people into higher criminal history categories, triggers career offender status, and precludes individuals from qualifying for safety valve relief. These are all areas where black defendants are disproportionately negatively impacted. As mentioned above, in 2015, black defendants comprised 20.5 percent of all defendants, but 34 percent of defendants in the top three criminal history categories, and 56.7 percent of defendants sentenced under the career offender guideline.[202] In addition, black defendants qualify for the safety valve far less often than any other group, primarily because of criminal history.[203]

### 3.   Invited Departure

If, as proposed, the Commission eliminates the rule of counting revocations and invites an upward departure under §4A1.3 for revocations, Defenders encourage the Commission to provide guidance on when to apply the departure. As discussed above, revocations occur for many different reasons, from the most technical violation to a new serious criminal conviction, as well as a wide range of revocation practices across the country. In light of this variation, guidance is appropriate to help narrow the field to revocations for serious violations that are not otherwise accounted for under the criminal history rules. One ready-made source of guidance on what constitutes a revocation for a serious violation is the grading system in Chapter 7 applicable to violations of federal probation and supervised release. For example, the Commission could

---

[199] *Id.*

[200] As mentioned above, *supra* note 123, scholars have urged sentencing commissions to examine the racial impact of criminal history score components and where there is a disparate impact, carefully examine the rationale and ensure it is narrowly tailored.

[201] Klingele, *supra* note 195, at 1046.  *See also* Urban Inst., *Examining Racial and Ethnic Disparities in Probation Revocation* 3 (Apr. 2014) ("We consistently found disparity in probation revocation outcomes to the disadvantage of black probationers."); Kevin F. Steinmetz & Jamilya O. Anderson, *A Probation Profanation: Race, Ethnicity, and Probation in a Midwestern Sample*, 6 Race & Just. 325, 339 (2016) ("Consistently, throughout this analysis, racial/ethnic status was found to significantly predict likelihood of probation failure."); Pamela Oliver, *Crimeless Revocations, part 3: Racial Patterns*, (Dec. 26, 2016) (finding Native American Indians and Blacks have highest rates of crimeless revocations in Wisconsin).

[202] *See* USSC, Individual Offender Datafiles 2015.

[203] *See* USSC, *Mandatory Minimum Report*, *supra* note 131, at xxviii, 354.

Honorable William H. Pryor
February 20, 2017
Page 42

specify that an upward departure from the defendant's criminal history category may be
warranted based on a revocation for a violation that did not independently receive criminal
history points and that would qualify as a Grade A or B violation under §7B1.1(a)(1).

### 4.  Interaction with §2L1.2

If the Commission amends §4A1.2 as proposed, it should ensure the same rule applies to §2L1.2,
and that revocations are not counted when measuring the length of a prior "sentence imposed."
One rule, applicable across the guidelines, is simple. And, as discussed above, many good
reasons support excluding revocations from the calculation of the "sentence imposed." Excluding
revocations improves the quality of "sentence imposed" as a proxy for the severity of the prior
offense,[204] and helps avoid unwarranted disparity.

To make clear that revocations are excluded from the calculation of the "sentence imposed" in
§2L1.2, in addition to promulgating the proposed amendment to §4A1.2, Defenders recommend
deleting one sentence from the definition of "sentence imposed" in the commentary to §2L1.2[205]
as follows:

> **"Sentence imposed"** has the meaning given the term "sentence of imprisonment"
> in Application Note 2 of subsection (b) of §4A1.2 (Definitions and Instructions
> for Computing Criminal History). ~~The length of sentence imposed includes any~~
> ~~term of imprisonment given upon revocation of probation, parole, or supervised~~
> ~~release.~~

### B.  An Invited Departure for Time-Served Should Be Added

Defenders support the Commission's proposal to amend §4A1.3 by specifying in the
commentary that a downward departure from a defendant's criminal history may be warranted in
a case in which the period of imprisonment actually served by the defendant—"time-served"—
was substantially less than the length of the sentence imposed for a conviction counted in the
criminal history score. While Defenders would prefer the Commission adopt time-served as the
rule for measuring criminal history,[206] until that happens, an invited downward departure for
time-served is a welcome addition to the guidelines.

---

[204] As discussed below, Defenders believe "time served" is an even better proxy.

[205] §2L1.2, comment. (n.2).

[206] *See* Letter from Marjorie Meyers, Chair, Federal Defender Sentencing Guidelines Committee, to the
Honorable Patti B. Saris, Chair, U.S. Sentencing Comm'n, at 6 (July 25, 2016) ("Due to the inconsistent
practices between various jurisdictions, measuring severity of prior offenses by looking at sentence
imposed creates unwarranted disparity."); Statement of Molly Roth Before the U.S. Sentencing Comm'n,
Washington D.C., at 1 (Nov. 5, 2015); Statement of the Federal Public and Community Defenders
submitted by Jon Sands, Chair, Sentencing Guidelines Committee of the Federal Public and Community
Defenders, at 40 (Mar. 9, 2001) ("We believe time served is the better measure because time served is the

Honorable William H. Pryor
February 20, 2017
Page 43

So long as the criminal history rules rely on the sentence imposed, an invited downward departure for time-served acknowledges that the current rule can result in unwarranted disparity. Even critics of Defenders' preferred time-served approach acknowledge the limitations of the current sentence imposed rule when addressing "multiple jurisdictions that have different laws regarding parole and other forms of early release."[207] In jurisdictions with "robust early release programs, . . . the announced sentence may not closely track the term of traditional prison-like confinement that the offender will serve. In some state systems, parole laws and other credit systems can reduce an offender's actually served sentence of incarceration dramatically."[208] In other words, the current rule of looking to the sentence imposed as a proxy for the seriousness of the offense results in unwarranted disparity. An invited departure recognizes this problem and provides a mechanism to address it.

Adding an invited departure to Chapter Four that tracks the time-served departure added to §2L1.2 last year also makes the guidelines consistent, by making the same time-served exception available whenever the guidelines look to the sentence imposed.

In response to the issue for comment about possible limitations on the time-served departure, Defenders urge the Commission to refrain from specifying particular exclusions. While we understand the interest in excluding cases where the sentence was reduced for reasons unrelated to the facts and circumstances of the defendant's case, we trust judges will understand that as well. Specifying such exclusions to the departure adds unnecessary complexity and invites appeals regarding whether the terms of the exclusion were satisfied.

Finally, if the Commission adds the invited departure, Defenders suggest one change to the proposed language that introduces what will now be a list of examples of situations where a downward departure due to inadequacy of criminal history may be warranted. Specifically, the Commission proposes amending §4A1.3, comment. (n.3) as follows:

> (A)    **Examples.—**A downward departure from the defendant's criminal history category may be warranted ~~if, for example,~~ based on any of the following circumstances:

---

actual punishment that has been meted out. Sentence imposed sets the maximum time that will be served, but most defendants do not serve the maximum because of good time credits or parole. Thus, a four-year prison term in one state may result in the same time served as a six-year term in another state.").

[207] Patrick A. Woods, *Assessing Time Served*, 15 Cardozo Pub. L. Pol'y & Ethics J. 1, 15 (2016).

[208] *Id.* at 15-16.

Honorable William H. Pryor
February 20, 2017
Page 44

Defenders propose this alternative approach:

> (A)      **Examples.—**A downward departure from the defendant's criminal history category may be warranted if, for example,

We believe our suggested language will better indicate that the specified examples are just that, examples, and not the exclusive bases for a downward departure.

## V.      Proposed Amendment #5: Bipartisan Budget Act

The Commission proposes amending the guidelines to address changes made by the Bipartisan Budget Act of 2015 to three existing statutes[209] addressing fraudulent claims under certain Social Security programs. Defenders have no objection to the Commission's proposal in Part A to respond to the addition of new conspiracy prohibitions by amending Appendix A to reference the three statutory provisions not only to §2B1.1, but also to §2X1.1. Defenders, however, oppose the Commission's proposal in Part B to respond to a new 10-year statutory maximum sentence for a subgroup of people convicted of violating these three statutes by adding yet another specific offense characteristic to the already unwieldy §2B1.1 guideline. The current guidelines at §2B1.1, §3B1.3, and §3B1.1 are more than adequate to guide courts toward sufficiently (and often unduly) severe penalties for a broad range of offenses, including those addressed in the Act.[210]

No evidence shows that the current guidelines are inadequate to guide courts on appropriate punishments for the subgroup of people who are convicted under these three statutes and subject to the new 10-year statutory maximum.[211] First, no one has been convicted of violating § 1011 in

---

[209] 42 U.S.C. §§ 408, 1011, & 1383a.

[210] Last year, the Commission proposed responding to this Act simply by amending Appendix A as proposed in Part A of this year's proposed amendments. The Commission did not propose adding a new specific offense characteristic or any other changes to Chapters Two or Three of the guidelines manual. Defenders supported this response to the Act. *See* Letter from Marjorie Meyers, Chair, Federal Defender Sentencing Guidelines Committee, to the Honorable Patti B. Saris, Chair, U.S. Sentencing Comm'n, at 13-16 (Mar. 21, 2016); *see also* Letter from Marjorie Meyers, Chair, Federal Defender Sentencing Guidelines Committee, to the Honorable Patti B. Saris, Chair, U.S. Sentencing Comm'n, at 11-13 (July 25, 2016). But following comment by members of Congress, the Justice Department and the Inspector General of the Social Security Administration, the Commission deferred action on the Act. *See* Remarks for Public Meeting, Chief Judge Patti B. Saris, Chair, U.S. Sentencing Comm'n, Washington, D.C., Apr. 15, 2016, http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20160415/Chairs-Remarks.pdf.

[211] The Bipartisan Budget Act of 2015 increased the maximum penalties under 42 U.S.C. §§ 408, 1011, and 1383a for certain persons: "a person who receives a fee or other income for services performed in connection with any determination with respect to benefits under this title (including a claimant representative, translator, or current or former employee of the Social Security Administration), or who is

Honorable William H. Pryor
February 20, 2017
Page 45

the past decade.[212] Second, neither the government nor sentencing courts have indicated that the guidelines are too low in cases prosecuted under the other two provisions. In the last three years, 56.8% of defendants sentenced for a conviction under 42 U.S.C. § 408 received sentences within the guideline recommended range, 41.2% received sentences below the guideline recommended range, and only 2.0% received sentences above the guideline recommended range.[213] Similarly, for defendants convicted under 42 U.S.C. § 1383a(a) and sentenced under §2B1.1, 48.5% received sentences within the guideline recommended range, 51.4% received sentences below the guideline recommended range, and not one defendant received a sentence above the guideline recommended range.[214]

The proposed amendment would add the 20th specific offense characteristic to §2B1.1. It would add unnecessary complexity to a guideline that already covers more than 5 pages, with more than a dozen pages of commentary full of complicated rules for calculating loss and applying the current 19 specific offense characteristics, many with several subparts. Applying this guideline is already difficult and time-consuming and can require lengthy sentencing hearings. The proposed amendment is a paradigm example of "factor creep,"[215] and is not necessary given the range of sentences already provided for in §2B1.1 combined with the adjustments in Chapter Three.

If the Commission is not convinced that the current guidelines provide adequate guidance on sentences for certain people under these three statutes, a better solution is the one the Commission identifies in the issues for comment: "provide an application note that expressly provides that, for a defendant subject to the ten years' statutory maximum in such cases, an adjustment under §3B1.3 ordinarily would apply." The Commission took a similar approach in §2D1.1, comment. (n.23), describing situations where §3B1.3 "ordinarily would apply." This invitation to use existing portions of the guidelines manual in certain cases is simpler than a new specific offense characteristic with set enhancement levels and floors. It also better accommodates the wide range of defendants who may fall under the new statutory maximum,

---

a physician or other health care provider who submits, or causes the submission of, medical or other evidence in connection with any such determination."

[212] USSC, *FY 2006-2015 Monitoring Dataset*.

[213] USSC, *FY 2013-2015 Monitoring Dataset*.

[214] *Id.*

[215] R. Barry Ruback & Jonathan Wroblewski, *The Federal Sentencing Guidelines: Psychological and Policy Reasons for Simplification*, 7 Psychol. Pub. Pol'y & L. 739, 752 (2001) ("In every guideline amendment cycle, law and order policymakers, whether they be in Congress, at the Department of Justice, or on the Sentencing Commission, petition the Commission to add more aggravating factors as specific offense characteristics or generally applicable adjustments to account more fully for the harms done by criminals.").

Honorable William H. Pryor
February 20, 2017
Page 46

from physicians who were instrumental in the fraud to translators who may have been paid a small fee for limited services.

If, despite these reasons against it, the Commission persists in its proposal to add the 20th specific offense characteristic to §2B1.1, Defenders urge the Commission to: (a) limit the enhancement to two levels without a floor; (b) specify that §3B1.3 does not apply; and (c) require, as proposed, that the defendant be convicted of one of the three statutory provisions identified in the Act and the statutory maximum term of ten years' imprisonment applies.[216]

**(a.) Limit the enhancement to two levels without a floor.** A two-level enhancement is more than adequate to address the offenses identified in the Act. Last year, the Department of Justice asked why the Commission was not recommending an enhancement "similar" to the two-level enhancement for Federal health care offenses at §2B1.1(7).[217] That 2-level enhancement applies only to Federal health care offenses with large loss amounts, between $1-7 million.[218] The current proposed amendment would apply to all convictions subject to the 10-year statutory maximum, regardless of the scale of the offense.

The proposed floors would result in guideline-recommended sentences that are disproportionately high for these non-violent offenses. Even the lower of the two bracketed floor options—12—is disproportionately high to other guideline-recommended sentences. For example, §2A2.3 provides an offense level of 7 for an assault where physical contact is made, or use of a dangerous weapon is threatened. The offense level is 9 for assault where the victim sustained bodily injury. §2A2.3(b). And 12 is the same offense level that applies to someone who has obstructed an officer where the victim sustained bodily injury. §2A2.4. A floor also fails to acknowledge the wide range of defendants—and degrees of culpability—that fall within the subgroup of people identified in the Act. A better solution is to let the current guidelines do their work. If the sentencing court perceives that the offense level understates the seriousness of the offense, the court is free to depart under §2B1.1, comment. (n.20(A)).

**(b.) Specify §3B1.3 does not apply.** Where a factor addressed in a Chapter Two enhancement significantly overlaps with a factor addressed in a Chapter Three adjustment, the guidelines

---

[216] The Commission's proposed amendments include several bracketed items, including whether the enhancement should be 2 or 4 levels, whether the floor should be 12 or 14, and whether the commentary should advise courts not to apply §3B1.3 or indicate that courts are "not preclude[d]" from applying §3B1.3.

[217] Letter from Michelle Morales, Acting Director, Office of Policy and Legislation, Dep't of Justice, to the Honorable Patti B. Saris, Chair, U.S. Sentencing Comm'n, at 37 (Mar. 14, 2006).

[218] *See* §2B1.1(b)(7).

Honorable William H. Pryor
February 20, 2017
Page 47

routinely advise against double counting by specifying not to apply both.[219] Because the new proposed specific offense characteristic would significantly overlap with the adjustment at §3B1.3 (Abuse of Position of Trust or Use of Special Skill), if the Commission adopts the proposed 20th specific offense characteristic, it should advise against double counting by specifying that if the enhancement applies, do not apply §3B1.3.

**(c.) Require that the defendant was convicted under the statutes identified in the Act, and that the statutory maximum of ten years' imprisonment applies.** The Commission's conviction-based approach to the proposed enhancement (enhancement applies when defendant was convicted under § 408(a), § 1011(a) or § 1383(a), and the statutory maximum term of ten years' imprisonment applies) is better than the relevant-conduct-based approach identified in the Issues for Comment (enhancement applies based on conduct described in the statutes). As Defenders have indicated in the past, sentencing based on relevant conduct presents numerous problems.[220] It provides prosecutors with "indecent power,"[221] and contributes to unwarranted disparity, undue severity, and disrespect for the law. Defenders oppose expanding the use of relevant conduct here.

## VI.  Proposed Amendment #6: Acceptance of Responsibility

We appreciate the Commission responding to significant concerns about the chilling effect the current language in §3E1.1[222] has on the defense's willingness to object to relevant conduct. We do not believe, however, that the proposed amendment adequately addresses the problem.

---

[219] *See, e.g.,* §2A3.1, comment. (n.3(B)) ("do not apply §3B1.3 (Abuse of Position of Trust of Use of Special Skill)" if related Chapter Two enhancement applies); §2A3.2, comment. (n.2(B)) (same); §2A3.4, comment. (n.4(B)) (same); §2B1.1, comment. (n.7) (same); §2B1.1, comment. (n.15) (same); §2G1.3, comment. (n.2(B)) (same); §2G2.6, comment. (n.2(B)) (same). The guidelines take a similar approach with other Chapter Three adjustments that overlap with Chapter Two enhancements. *See, e.g.,* §2G2.1, comment. (n.4) ("If subsection (b)(4)(B) applies, do not apply §3A1.1(b)."); §2G2.2, comment. (n.4) (same); §2K2.6, comment. (n.2) ("If subsection (b)(1) applies, do not apply the adjustment in §3B1.5 (Use of Body Armor in Drug Trafficking Crimes and Crimes of Violence)."); §2L1.1. comment. (n.5) ("If an enhancement under subsection (b)(8)(A) applies, do not apply §3A1.3 (Restraint of Victim).").

[220] *See, e.g.,* Letter from Marjorie Meyers, Chair, Federal Defender Sentencing Guidelines Committee, to the Honorable Patti B. Saris, Chair, U.S. Sentencing Comm'n, at 24-31 (May 17, 2013).

[221] Kate Stith, *The Arc of the Pendulum: Judges, Prosecutors, and the Exercise of Discretion*, 117 Yale L. J. 1420, 1425 (2008).

[222] Specifically, a defendant's right to dispute the scope of relevant conduct under USSG §1B1.3 – a right acknowledged in §6A1.3 and Federal Rule of Criminal Procedure 32(i) – is undermined by the language in §3E1.1, comment. (n.1(A)), which states that credit for acceptance of responsibility is contingent upon "not falsely denying any additional relevant conduct," and that "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."

Honorable William H. Pryor
February 20, 2017
Page 48

Defenders strongly encourage the Commission to remove from §3E1.1 all references to relevant conduct and instead reference only the offense of conviction. In the alternative, the Commission should make clear that a defendant who does not obstruct or impede the administration of justice pursuant to §3C1.1, but who otherwise challenges the legal or factual basis for relevant conduct, is eligible for a reduction under subsection (a) and should not be penalized for exercising the right to have disputed sentencing factors resolved in accordance with §6A1.2 and §6A1.3.[223]

### A. The Commission Should Remove from §3E1.1 All References to Relevant Conduct and Reference Only the Offense of Conviction

The Commission requests comment on whether it should "remove from §3E1.1 all references to relevant conduct for which the defendant is accountable under §1B1.3, and reference only the elements of the offense." Defenders strongly support such an approach because looking to relevant conduct when assessing acceptance of responsibility undermines a fair and just resolution of disputed sentencing factors without serving legitimate sentencing purposes.

Defenders recommend the following changes to the commentary in §3E1.1, notes 1(A), 3, and 4:

1. In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:

(A) truthfully admitting the elements of the ~~conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility.~~

3. Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the elements of ~~conduct comprising~~ the offense of conviction, ~~and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under §1B1.3 (Relevant Conduct) (see Application Note 1(A)),~~ generally will constitute ~~significant evidence~~ of acceptance of responsibility for the purposes of subsection (a). However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. Arguing that the government has not carried its burden of

---

[223] The guidelines make clear that a party has the right to object to a presentence report, USSG §6A1.2, and "[w]hen a dispute exists about any factor important to the sentencing determination, the court must ensure that the parties have an adequate opportunity to present relevant information." USSG §6A1.3, comment.

Honorable William H. Pryor
February 20, 2017
Page 49

> proving relevant conduct or other enhancements by a preponderance of the evidence or that the evidence does not meet the legal definition of those provisions is not inconsistent with acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.

> 4. Conduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 may apply.

The reference to relevant conduct in § 3E1.1 should be removed because it does not serve the purposes the Commission originally contemplated when it promulgated the guidelines and undermines a fair and accurate sentencing proceeding. When the guidelines were first created, the Commission believed that a defendant's acceptance of responsibility was a "sound indicator of rehabilitative potential" that should be rewarded with a reduced sentence.[224] The Commission's recent recidivism report, however, reveals that the acceptance of responsibility provision has not proven to be a "sound indicator of rehabilitative potential." The report concluded that an adjustment for acceptance of responsibility "was not associated with lower recidivism rates."[225]

The Commission included relevant conduct in the sentencing guidelines as a compromise between real and charged offense sentencing to prevent prosecutors from being able to "influence sentences by increasing or decreasing the number of counts in an indictment." *See* USSG Ch. 1, Pt. A, 4(a). This presumably was to promote one purpose of the guidelines – reducing unwarranted disparity. But the reference to relevant conduct in §3E1.1 undermines a defendant's ability to challenge allegations at sentencing that often have a significant impact on the guideline calculation.

---

[224] USSC, *Preliminary Draft of Sentencing Guidelines*, Ch. Three: Offender Characteristics: Post-Offense Conduct, Acceptance of Responsibility §B321, comment. (1986). *See also United States v. Garrasteguy*, 559 F.3d 34, 39 (1st Cir. 2009) (noting that acceptance of responsibility recognizes "increased potential for rehabilitation"); *United States v. Belgard*, 694. F. Supp. 1488, 1497 (D. Ore. 1988) (reduction for acceptance of responsibility recognizes "increased potential for rehabilitation among those who feel and show true remorse for their anti-social conduct"), *aff'd sub nom, United States. v. Summers*, 895 F.2d 615 (9th Cir. 1990).

[225] USSC, *Recidivism Report*, *supra* note 33, at 21. *See also id.* at App. A-1, A-2, and A-3 (defendants who received no adjustment for acceptance of responsibility had lower rearrest, reconviction, and incarceration rates than those who received a 2- or 3-level adjustment).

Honorable William H. Pryor
February 20, 2017
Page 50

The guidelines already allow an increase in sentence based on relevant conduct under the lowest standard of proof and with a low threshold of reliable evidence.[226] Thus, a prosecutor may choose to charge a defendant with a lesser offense only to seek a significant enhancement at sentencing based upon relevant conduct established through a de minimis form of proof.[227] For example, prosecutors often present uncorroborated hearsay evidence to probation officers that greatly increases the drug quantity for which defendants are held responsible,[228] and probation officers typically include it in the report without further investigation into its accuracy. Even when the information in the presentence report is objectively unreliable, the defense must object[229] to the government's version of the conduct and, in some circuits, the defense bears the burden of "articulat[ing] the reasons why the facts contained therein are untrue or inaccurate."[230] Due process requires an opportunity to be heard on these allegations but inclusion of relevant conduct in §3E1.1 chills that opportunity.

---

[226] *See, e.g.*, *United States v. Sandidge*, 784 F.3d 1055 (7th Cir. 2015) ("[A] sentencing court may credit testimony that is totally uncorroborated and comes from an admitted liar, convicted felon, or large scale drug-dealing, paid government informant.") (citing *United States v. Clark*, 583 F.3d 803, 813 (7th Cir. 2008)).

[227] *See United States v. Miller*, 910 F.2d 1321, 1331 (6th Cir. 1990) (Merritt, J., dissenting) ("The Guidelines obviously invite the prosecutor to indict for less serious offenses which are easy to prove and then expand them in the probation office.").

[228] *See generally* Claudia Catalan, *Admissibility of Testimony at Sentencing, Within Meaning of USSG § 6A1.3, Which Requires Such Information be Relevant and Have "Sufficient Indicia of Reliability to Support its Probable Accuracy,"* 45 A.L.R. Fed. 2d 457 (originally published in 2010).

[229] *See* Fed. R. Crim. P. 32(i)(3)(A) (permitting court to "accept any undisputed portion of the presentence report as a finding of fact"); USSG §6A1.3 (governing opportunity of parties to object to a factor important to the sentencing determination); *United States v. McCully*, 407 F.3d 931, 933 (9th Cir. 2005) (no plain error for imposing upward enhancements for drug quantity, possession of a weapon, and obstruction of justice where presentence report set forth facts supporting enhancements and defendant did not object); *United State v. Wade*, 458 F.3d 1273, 1277 (11th Cir. 2006) ("failure to object to allegations of fact in a PSI admits those facts for sentencing purposes").

[230] *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990). *See also*, *United States v. Cirilo*, 803 F.3d 73, 75 (1st Cir. 2015) ("where a defendant's objections to a presentence investigation report are wholly conclusory and unsupported by countervailing evidence, the sentencing court is entitled to rely on the facts set forth in the presentence report"); *United States v. Grant*, 114 F.3d 323, 328 (1st Cir. 1997) (even though defendant objected to certain facts in the presentence report, he "did not provide the sentencing court with evidence to rebut the factual assertions" so the "court was justified in relying on the contested facts"); *United States v. Moran*, 845 F.2d 135, 138 (7th Cir. 1988) (approving district court's decision to accept "controverted matters in the report unless the defendant presented [contrary] evidence"). *But see United States v. Hudson*, 129 F.3d 994, 995 (8th Cir. 1997); *United States v. Wilken*, 498 F.3d 1160, 1169-70 (10th Cir. 2007).

Honorable William H. Pryor
February 20, 2017
Page 51

Including relevant conduct in §3E1.1 gives prosecutors excessive control over the plea bargaining and sentencing process by giving them a tool to discourage the defendant from challenging the government's version of the offense conduct.[231] If the defense fails to carry the burden of proving that the government's allegations are untrue or inaccurate and the court finds defense counsel's argument frivolous solely because the challenge was unsuccessful, the court can deny the reduction for acceptance of responsibility. The Commission should not further ease the government's burden of proof by requiring a defendant to either admit relevant conduct or take the risk of having an objection found "frivolous."

A provision that permits a court to deny a 2-level reduction because it considers a defendant's challenge to be frivolous actually undermines the principles of real offense sentencing. If defense counsel must make a strategic decision on whether a judge will consider a challenge frivolous and chooses not to make the challenge out of fear that the court will deny the client acceptance of responsibility, then the defendant may have to serve a sentence that does not accurately account for real offense conduct.[232]

Including relevant conduct also results in unwarranted disparity because courts take radically different approaches to applying the rule. This is most apparent in the disparity arising from the different interpretations of what is a "frivolous" challenge. A survey of Defenders throughout the country shows vastly different judicial views on whether a defendant's unsuccessful challenge to relevant conduct should result in a denial of the adjustment for acceptance of responsibility.

---

[231] The National Association of Criminal Defense Lawyers pointed out fifteen years ago how the relevant conduct provisions give "the government an opportunity to enter into plea agreements without having to carry the burden of reasonable doubt standards for the enhancement of relevant conduct issues." NACDL Sentencing and Post-Conviction Comm., Written Testimony 24-25 (Feb. 25, 1992) (Concerning United States Sentencing Commission's Proposed Amendments to Sentencing Guidelines and Policy Statements).

[232] Take, for example, a defendant in criminal history category I who pleads guilty to possession of marijuana with intent to distribute. He has a base offense level of 10, but faces a 2-level enhancement for possession of a dangerous weapon under §2D1.1(b)(1). If he does not contest the enhancement and is given a 2-level reduction for acceptance of responsibility, his final offense level is 10, with a range of 6-12 months in Zone B and the possibility of a probationary sentence with home confinement. If, however, defense counsel challenges the enhancement but loses, and the defendant is denied acceptance, the final offense level is 12 and in Zone C where the guidelines recommend imprisonment. Under this scenario, a defendant may forego contesting the enhancement to increase the possibility of a probationary sentence. If the facts, however, actually show that the weapon was not connected to the offense, then the sentence would not truly reflect the real offense.

Cf. Alexa Clinton, Taming the Hydra: Prosecutorial Discretion under the Acceptance of Responsibility Provision of the US Sentencing Guidelines, 79 U. Ch. L. Rev. 1467, 1494 (2013) (discussing how government control over the additional 1-level reduction under §3E1.1(b) may result in an increased sentence because it creates a disincentive for the defendant to challenge relevant conduct).

Honorable William H. Pryor
February 20, 2017
Page 52

Some judges do not penalize the defense for holding the government to its burden of proof on relevant conduct, whether the challenge is successful or not. Other judges, however, view an unsuccessful challenge as justifying a denial of the reduction. For example, the Seventh Circuit concluded:

> Contesting the veracity of the alleged relevant conduct is no doubt permissible and often perfectly appropriate. However, if a defendant denies the conduct and the court determines it to be true, the defendant cannot then claim that he has accepted responsibility for his actions.

*United States v. Cedano-Rojas*, 999 F.2d 1175, 1182 (7th Cir. 1993).[233] Even an unsuccessful challenge to the credibility of a witness has been deemed sufficient to deny a defendant credit for acceptance of responsibility.[234] The varying view among courts[235] as to what constitutes a

---

[233] The defendant in *Cedano-Rojas* challenged the previous requirement that a defendant admit relevant conduct to receive the acceptance reduction, but the Guideline was amended pending his appeal to permit acceptance as long as there was no false or frivolous denial. *Cedano*-Rojas, 999 F.2d at 1181-82. Subsequent cases reaffirm the principle that a defendant who denies relevant conduct has not accepted responsibility. *See, e.g., United States v. Brown,* 47 F.3d 198, (7th Cir. 1995) ("If a defendant denies relevant conduct and the court determines such conduct occurred, the defendant cannot claim to have accepted responsibility for his actions."); *United States v. Sandidge*, 784 F.3d 1055, 1064 (7th Cir. 2015) (affirming denial of acceptance of responsibility adjustment simply because court rejected defendant's factual challenge to applicability of cross-reference). *See also United States v. Ratliff*, 376 F. App'x 830, 843 (10th Cir. 2010) (quoting *Brown* to uphold court's denial of acceptance of responsibility adjustment for defendant who challenged extent of the fraud committed); *United States v. Skorniak*, 59 F.3d 750, 757 (8th Cir. 1995) ("a defendant who denies relevant conduct that the court later determines to have occurred has acted in a manner inconsistent with clearly accepting responsibility"); *Elliott v. United States*, 332 F.3d 753, 766 (4th Cir. 2003) ("a denial of relevant conduct is 'inconsistent with acceptance of responsibility'"); *United States v. Burns*, 781 F.3d 688, 690, 693 (4th Cir.), *cert. denied*, 135 S. Ct. 2872 (2015) (defendant who pled guilty to a firearm offense argued that cross-reference to aggravated assault rather than attempted murder should apply because of insufficient evidence of mens rea; even though the defendant did not testify, the court affirmed denial of acceptance of responsibility merely because he "falsely denied" relevant conduct). *See generally* Kimberly Winbush, Annotation, *Downward Adjustment for Acceptance of Responsibility under USSG § 3E1.1—Drug Offenses*, 17 A.L.R. Fed. 2d 193 (2007 & Supp. 2016) (citing numerous cases where the defendant was denied a reduction for acceptance of responsibility because he or she contested relevant conduct).

[234] *See, e.g., United States v. Berthiaume*, 233 F.3d 1000, 1004 (7th Cir. 2000) (upholding district court's decision that defendant "frivolously" contested drug quantity calculation because court rejected the challenge to the reliability of the government's witnesses); *United States v. Jones*, 539 F.3d 895, 897-98 (8th Cir. 2008) (defendant's unsuccessful challenge to credibility of cooperating witness was sufficient to deny acceptance of responsibility adjustment even though appellate court acknowledged that the witness was "not a strong witness" and his "testimony as to drug transactions amounts and frequency was confusing and often internally inconsistent").

[235] *See* discussion *infra* pp. 55-57 (citing case law that shows differing judicial views on meaning of "frivolously contest").

Honorable William H. Pryor
February 20, 2017
Page 53

"frivolous" challenge is directly contrary to the Commission's goal of promoting the uniform application of the Guidelines.

Some courts have upheld the denial based upon the court's disagreement with the lawyer's argument even if the defendant stands silent. For example, in *United States v. Purchess*, 107 F.3d 1261, 1266-69 (7th Cir. 1997), defense counsel contested relevant conduct without proffering any evidence and the defendant exercised his right to remain silent. The Seventh Circuit concluded that the "defendant and his attorney appear to have been attempting to manipulate the Guidelines" and suggested that whether the attorney proffers evidence or not, "the court can alternatively question the otherwise silent defendant to determine if the defendant understands and adopts the attorney's statements challenging facts underlying possibly relevant conduct. . . . If the defendant does understand and agrees with the argument, then the factual challenges can be and should be attributed to him. If the defendant rejects the attorney's argument, the court can simply disregard it. Such a procedure would insure that a defendant would be unable to reap the benefit of his attorney's factual challenges without risking the acceptance of responsibility reduction." *Id*. at 1267, 1269.[236] The Eleventh Circuit has encouraged denial of an acceptance of responsibility reduction when the defendant's lawyer contested the significance of the facts set forth in the presentence report[237] or raised a constitutional challenge to the constitutionality of his convictions even after pleading guilty.[238]

In sum, denying an acceptance of responsibility reduction merely because a defendant has contested relevant conduct and lost gives prosecutors undue power, undermines the concept of real offense sentencing, and creates unwarranted disparity, without adding to the assessment of a

---

[236] *See also United States v. Lister*, 432 F.3d 754, 759-60 (7th Cir. 2005) (following *Purchess* and denying acceptance of responsibility reduction to a defendant whose attorney challenged the chronology of events presented in the PSR; when the court questioned Lister about whether he agreed with the challenges, Lister stated that he relied on his attorney – an answer that the appellate court characterized as "legal hair-splitting, ultimately frustrating the court's determination"); *United States v. Dong Jin Chen,* 497 F.3d 718, 720-21 (7th Cir. 2007) (following *Purchess* and denying acceptance of responsibility reduction based on the defendant contesting facts contained in the PSR that were established at sentencing hearing; rejecting argument that the defendant did not have sufficient command of the English language to be excused from his conduct); *United States v. Booker*, 248 F.3d 683, 690 (7th Cir. 2001) (affirming denial of acceptance reduction because defendant's denial of relevant conduct was "meritless").

[237] *United States v. Smith*, 127 F.3d 987, 989 (11th Cir. 1997) (en banc) (even though district court reduced defendant's offense level for acceptance of responsibility, the en banc court opined that the defendant's challenge to whether evidence in the PSR established fraudulent intent was "factual", not "legal" and would have justified denial of the reduction for acceptance of responsibility).

[238] *United States v. Wright*, 133 F.3d 1412, 1413-14 (11th Cir. 1998) ("even if the district court's conclusion rested *exclusively* on Wright's challenges to the constitutionality of his convictions, the district court's refusal to reduce Wright's offense level was permissible").

Honorable William H. Pryor
February 20, 2017
Page 54

defendant's potential for rehabilitation. Therefore, the Commission should delete from §3E1.1 any reference to relevant conduct and amend the guideline to focus on the offense of conviction.

### B. Whether a Defendant is Entitled to an Adjustment for Acceptance of Responsibility Should Not Depend upon the Court's Assessment of Whether the Challenge Is "Frivolous" or "Non-frivolous," Particularly Given the Chilling Effect Such an Assessment Has on a Lawyer's Ethical Responsibilities

Whether or not the Commission chooses to reference relevant conduct in §3E1.1, a defendant's eligibility for a reduction for acceptance of responsibility should not depend upon a court's subjective assessment of frivolity. The Commission's proposed amendment to §3E1.1 does not resolve the myriad problems associated with the current wording of the guideline. The proposed language merely converts an affirmative statement about how a frivolous denial of relevant conduct is inconsistent with acceptance of responsibility into a negative statement that a non-frivolous denial does not preclude relief. The term "non-frivolous" is as subjective as the term "frivolous."[239] Under either wording, a defendant who makes a challenge that the court deems "frivolous" is likely to be denied acceptance of responsibility. Consequently, the continued risk of losing one of the few available reductions in the length of a term of imprisonment will deter defense lawyers from "making reasonable arguments in defense of their clients."[240]

### 1. Only Defendants Who Obstruct Justice in Contesting Relevant Conduct Should be Ineligible for a Reduction under §3E1.1

If the Commission chooses not to remove the reference to relevant conduct from §3E1.1, Defenders suggest the following amendment to the guideline:

(A) truthfully admitting the elements of the conduct comprising the offense(s) of conviction, and truthfully admitting ~~or not falsely denying~~ any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, ~~a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility.~~ a defendant who

---

[239] As Justice Douglas recognized, the "frivolity standard" is "elusive." *See* Brent E. Newton, *Almendarez-Torres and the Anders Ethical Dilemma*, 45 Hous. L. Rev. 747, 757 (2008) (quoting *Cruz v. Hasck*, 404 U.S. 559, 65 (1971) (Douglas, J., concurring)). The problem results from the "fine line 'between the tenuously arguable and the frivolous.'" Further, there is a distinction between factual and legal frivolity. *Id.* (quoting *Nagle v. Alspach*, 8 F.3d 141, 145 (3d Cir. 1993)) (other citations omitted).

[240] *Edwards*, 635 F. App'x at 197 (Merritt, J., dissenting).

Honorable William H. Pryor
February 20, 2017
Page 55

> challenges the legal or factual basis for relevant conduct is eligible for a reduction under subsection (a) provided the defendant did not obstruct or impede the administration of justice pursuant to §3C1.1.

This language would sanction the defendant whose claim is patently false without the chill associated with the court's subjective view of a factual or legal dispute about relevant conduct.

### 2.   Tying a §3E1.1 Reduction to the Court's Assessment of Whether a Challenge is "Frivolous" or "Non-Frivolous" Has Serious Due Process Implications and Infringes on a Lawyer's Ethical Responsibilities

The Commission should acknowledge that reasonable lawyers can disagree about the legal and factual scope of relevant conduct, including disputes about whether the government's allegations are based upon sufficiently reliable evidence, and whether the evidence presented to support an enhancement satisfies the preponderance of the evidence standard. Instructing a court to decide whether to penalize a defendant for challenging relevant conduct based upon the court's view of whether the challenge is frivolous raises due process concerns and chills the rights of defendants to put the government to its burden of proof – a right which is recognized in §6A1.2 (allowing objections to presentence reports) and §6A1.3 (resolution of disputed sentencing factors).[241] And, as discussed above, also results in unwarranted disparity.

The lack of a definition of frivolity has resulted in inconsistent application of the acceptance of responsibility reduction. As previously discussed, some courts consider "frivolous" as any unsuccessful challenge to relevant conduct.[242] Other courts, however, have taken a more refined approach to the meaning of frivolous by focusing on whether the challenge "lacks an arguable basis in law or fact" or is "based on an 'indisputably meritless legal theory."[243] The Fifth Circuit distinguishes between a legal and a factual challenge, opining that "merely pointing out that the evidence does not support a particular upward adjustment or other sentencing calculation, does not strike us as a legitimate ground for ruling that the defendant has not accepted responsibility."[244]

---

[241] The first Commissioners opined that "[t]he guidelines enhance procedural fairness by largely determining the sentence according to specific, identified factors, each of which a defendant has an opportunity to contest, through evidentiary presentation or allocation, at a sentencing hearing." William W. Wilkins, Jr., *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines*, 41 S.C. L. Rev. 495 (1990).

[242] *See supra* note 236.

[243] *See United States v. Santos*, 537 F. App'x 369, 375 (5th Cir. 2013) (citing *Neitzke v. Williams,* 490 U.S. 319, 327 (1989) and *Biliski v. Harborth,* 55 F.3d 160, 162 (5th Cir. 1995)).

[244] *See United States v. Santos*, 537 F. App'x 369, 375 (5th Cir. 2013) (*citing United States v. Nguyen*, 190 F.3d 656, 659 (5th Cir. 1999) and finding that court erred in denying acceptance of responsibility

Honorable William H. Pryor
February 20, 2017
Page 56

Even judges within the same circuit court do not agree on the meaning of "frivolously contest." The Sixth Circuit's decision in *United States v. Edwards*, 635 F. App'x. 186, 188-89 (6th Cir. 2015), demonstrates the ambiguity of the term "frivolous" and explains the dilemma attorneys face in deciding whether to challenge an adjustment. Edwards pled guilty to conspiracy to possess with intent to distribute 500 grams or more of cocaine and 28 grams or more of cocaine base. The final PSR stated that "Edwards should receive a four-level increase under USSG §3B1.1(a) for being an organizer or leader of criminal activity that involved five or more participants, because Edwards had directed the activities of others and recruited participants for the offense." *Id*. at 189. It also recommended a three-level reduction for acceptance of responsibility. Edwards objected to the §3B1.1 enhancement, arguing that he did not play an aggravating role and the offense did not involve five or more participants. The court disagreed and increased Edwards' offense level by four points, pursuant to §3B1.1(a). The court also concluded that, in contesting the leadership-role enhancement, Edwards had frivolously denied relevant conduct, and therefore refused to grant Edwards a reduction for acceptance of responsibility. A panel majority on the Sixth Circuit affirmed the district court's decision.

Judge Merritt dissented, noting that the application of the role enhancement was "debatable," and that the lengthier sentence imposed "deter[s] defense lawyers from making reasonable arguments in defense of their clients":

> The court upholds a 15-year drug sentence for a first-time offender. It does so by affirming a debatable "organizer or leader" enhancement that added many years to the sentence and then added more years by denying Edwards an "acceptance of responsibility" deduction—all because at sentencing his lawyer contested the applicability of the enhancement. The 15-year sentence is much longer than necessary to deter this first-time offender from further violations but does deter defense lawyers from making reasonable arguments in defense of their clients.

***

> I do not believe that a criminal defendant's choice to object to the "organizer/leader" enhancement—when it was in dispute by various parties throughout the pendency of the case—is "frivolous." A reduction for accepting responsibility is supposed to be accorded to a criminal defendant who enters a guilty plea and "truthfully admits the conduct compromising the offense." U.S.S.G. § 3E1.1, app. n.3. At the sentencing hearing, defense counsel objected to and argued against the 4-level "organizer or leader" enhancement, but Edwards had consistently admitted the offense conduct. He admitted having contacts with

---

simply because defendant objected to sufficiency of evidence supporting importation enhancement). *See also United States v. Patino-Cardnas*, 85 F.3d 1133, 1136 (5th Cir. 1996) (court improperly denied reduction for acceptance of responsibility because defendant "objected to the legal characterization of leadership role given his actions").

Honorable William H. Pryor
February 20, 2017
Page 57

> the other conspirators. His counsel only disputed that those contacts demonstrated that he was an organizer or leader. Counsel did not deny any conduct. He only argued that Edwards' conduct did not suggest a leadership role.
>
> The evidence regarding the significance and extent of those contacts was somewhat equivocal and should have been open for debate without being deemed a "frivolous objection" to relevant conduct. Simply put, Edwards did not deny any conduct. He only denied that his conduct should be characterized as a "leadership role."

*United States v. Edwards*, 635 F. App'x 186, 196 (6th Cir. 2015) (Merritt, J., dissenting).

Judge Merritt's acknowledgment of the deterrent effect of the court's ruling on defense counsel's willingness to raise arguments on behalf of a client is noteworthy. Permitting a court to deny acceptance of responsibility to a defendant based upon the court's belief that the defense attorney presented a frivolous challenge to relevant conduct merely because the defense loses gives the court extensive power to control litigation and impinge on the lawyer's ethical responsibilities to zealously represent his or her clients.[245]

In conclusion, the manner in which some courts consider any unsuccessful challenge to relevant conduct as "frivolous," makes defense attorneys face a "Hobson's choice"[246]: if they challenge relevant conduct, they run the risk that their client will be denied a reduction in sentence. But if they do not raise the challenge, they run the risk of being ineffective advocates. To resolve this dilemma and ensure that a defendant's due process rights are protected, the Commission should amend §3E1.1 as suggested by Defenders.

### C.  The Commission Should Not Include in §3E1.1 Any Reference to Departures/Variances or Informal Challenges to Relevant Conduct

The Commission requests comment on whether it should reference "informal challenges" to relevant conduct or "broaden the proposed provision to include other sentencing considerations, such as departures or variances." For the same reasons stated earlier, Defenders believe that the Commission should refrain from adding more ambiguity to the guideline. Mentioning informal challenges to relevant conduct, departures or variances, and using the ambiguous term "non-

---

[245] *See* Margareth Etiene, *Remorse, Responsibility, and Regulating Advocacy: Making Defendants Pay for the Sins of Their Lawyers*, 78 N.Y.U. L. Rev. 2103, 2165 (2003) (discussing how the acceptance of responsibility provision in the guidelines "is the loophole that permits judges to regulate defense attorney conduct with the threat of higher sentences for their clients"). *See also* Hadar Aviram et al., *Check, Pleas: Toward a Jurisprudence of Defense Ethics in Plea Bargaining*, 41 Hastings Const. L.Q. 775, 822-23 (2014) (noting how judges may "extend defendant's sentence in response" to an attorney's "adversarial tactics that judges deem unnecessary").

[246] *Cf.* Newton, *supra* note 239, at 752 (discussing Hobson's choice lawyers must make in raising *Almendarez-Torres* claims).

Honorable William H. Pryor
February 20, 2017
Page 58

frivolous" suggest that the court should make the same subjective assessments of the defense position as it does now. If the government seeks an upward departure or variance, the defendant should have an absolute right to contest it without fear that the court may use an unsuccessful challenge to further penalize him or her by denying a reduction for acceptance of responsibility.

## VII.   Proposed Amendment #7: Miscellaneous Amendments

### A.  Parts A-C

Defenders have no objection to the miscellaneous amendments in response to the Transnational Drug Trafficking Act of 2015, International Megan's Law, and the Chemical Safety Act.

In the future, the Commission should revisit the 6- and 8-level enhancements under §2A3.5(b)(1), which apply "[i]f, while in failure to register status, the defendant committed" "a sex offense against someone other than a minor," "a felony offense against a minor not otherwise covered by subdivision (C)," or "a sex offense against a minor." Those enhancements apply when the court finds by a preponderance of evidence, and with evidence that need not comply with the Federal Rules of Evidence, that the defendant committed a specified offense.[247] To ensure greater due process protections for enhancements that can result in a 310% increase in sentence, the enhancement should be limited to individuals who were actually convicted of committing a specific offense while in failure to register status.

### B.  Part D: Computer Enhancement at §2G1.3

The Commission proposes amending the commentary regarding the computer enhancement at §2G1.3(b)(3) to specify that commentary note 4 applies only to subpart (A) of the computer enhancement (using a computer to "persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct"), and not to subpart (B) (using a computer to "entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with a minor"). Defenders propose a different approach to this issue, and encourage the Commission to eliminate the computer enhancement at §2G1.3(b)(3) and related commentary entirely, or at least eliminate the enhancement in subpart (B) regarding solicitation.

We recommend eliminating or shrinking the scope of the computer enhancement because it fails to distinguish among defendants. As the Commission has noted in the context of a different guideline, changes in computer and Internet technologies used by typical defendants can affect whether a sentencing scheme adequately distinguishes among defendants.[248] The computer enhancement at §2G1.3(b)(3), similar to the computer enhancement at §2G2.2(b)(6), because it

---

[247] *See United States v. Lott*, 750 F.3d 214, 220-21 (2d Cir. 2014) (guideline does not require a conviction for enhancement to apply); *United States v. Romeo*, 385 F. App'x 45, 49 (2d Cir. 2010) (relying on allegations in presentence report to uphold enhancement by a preponderance of the evidence).

[248] USSC, *Report to Congress: Federal Child Pornography Offenses* ii (Dec. 2012).

Honorable William H. Pryor
February 20, 2017
Page 59

applies to so many defendants, fails to "differentiate among offenders in terms of their culpability."[249] Last year, the computer enhancement at §2G1.3(b)(2) (either subpart (A) or (B)) was applied to 81.2% of defendants sentenced under §2G1.3.[250] The rate for subpart (B) alone was 45.4%.[251] At the same time, the rate of within guideline sentences for this guideline fell to 44.5% with more than 50% of defendants sentenced below the guideline recommended range.[252] Computer enhancements, particularly for solicitation, are out-of-date in this digital era, and fail to adequately distinguish among defendants.

## VIII.   Proposed Amendment #8: Marihuana Equivalency

Defenders do not object to the Commission's proposal to change the term "marihuana equivalency" to "converted drug weight" or the name of the "Drug Equivalency Tables" to "Drug Conversion Tables." We believe, however, that the Commission should amend the guideline commentary to explain the change. The term of art – "marihuana equivalency" – has been used in the guidelines, and case law interpreting the guidelines, since 1991 when the Commission opted to "simplify[y] the application of the Drug Equivalency Table by referencing the conversions to one substance (marihuana) rather to four substances." USSG App. C, Amend. 396, Reason for Amendment (Nov. 1. 1991). To facilitate future legal research, it would be helpful for the Commission to explain the change in the commentary on Use of Drug Conversion Tables in addition to the Reason for Amendment. We recommend explanations in both places based on our experience that many practitioners are not as familiar with Appendix C to the guidelines, and are more likely to read the commentary and notice changes made to the manual itself. While such repetition may not be necessary with every amendment, because of the long reliance on this term of art in a heavily used and litigated guideline, we recommend it in this instance. [253]

Specifically, Defenders suggest that the Commission add an explanation for the change at the beginning of §2D1.1, comment. (n. 8) – Use of Drug ~~Equivalency~~ Conversion Tables:

> Background: The Drug Conversion Table was previously named the Drug Equivalency Table. The base offense levels for drugs that were not listed in the Drug Quantity Tables were originally determined by using the Drug Equivalency Table to convert the quantity of the controlled substance involved to its

---

[249] *Id.* at iii.

[250] USSC, *Use of Guidelines and Specific Offense Characteristics, Offender Based, Fiscal Year 2015.*

[251] *Id.*

[252] USSC, *2015 Sourcebook of Federal Sentencing Statistics* tbl. 28.

[253] A Westlaw search of the terms "(marijuana marihuana) /1 equivalen! & guideline" turned up 1140 cases and 70 secondary sources.

marihuana, heroin, and cocaine equivalency. In 1991, the Commission amended the guidelines to use a single conversion factor – "marihuana equivalency," which was meant to simplify application of the guidelines. USSG App. C, Amend. 396 (Nov. 1, 1991). In 2017 the Commission replaced the term "marihuana equivalency" with a more generic term: "converted drug weight." USSG App. C, Amend. ___ (Nov. 1, 2017).

## IX.    Proposed Amendment #9: Technical Amendments

Defenders have no objections to most of the technical amendments proposed by the Commission. We do, however, question the Commission's proposed clerical changes to the commentary to Ch. 2 guidelines captioned "Statutory Provisions." The guideline commentary for each Chapter 2 offense does not consistently refer to all statutes referenced to a particular guideline in the statutory index. And some commentary adds a reference to Appendix A for additional statutory provisions whereas others do not. To simplify the guidelines, and lessen the commentary, the statutory references need only appear in Appendix A. Accordingly, Parts C (4), (5), (6), and (7) of the Technical Amendments are not necessary. The better course of action is to delete the reference to "Statutory Provisions" from all of the Chapter 2 commentary.

## X.    Conclusion

As always, we appreciate the opportunity to submit comments on the Commission's proposed amendments.  We look forward to continuing to work with the Commission on matters related to federal sentencing policy.


                                    Very truly yours,
                                    /s/ *Marjorie Meyers*
                                    Marjorie Meyers
                                    Federal Public Defender
                                    Chair, Federal Defender Sentencing Guidelines Committee




cc:    Rachel E. Barkow, Commissioner
       Jonathan J. Wroblewski, Commissioner *Ex Officio*
       J. Patricia Wilson Smoot, Commissioner *Ex Officio*
       Kenneth Cohen, Staff Director
       Kathleen Cooper Grilli, General Counsel

**Appendix A**

**Presumption of Probation Recommendation:**

## § 5B1.1. Imposition of a Term of Probation

(a) Subject to the statutory restrictions in subsection (b) below, a sentence of probation is ==resumed to be appropriate== ~~authorized~~ if:

    (1) the applicable guideline range is in Zone A of the Sentencing Table; or

    (2) the applicable guideline range is in Zone B of the Sentencing Table and the court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention as provided in subsection (c)(3) of §5C1.1 (Imposition of a Term of Imprisonment).

\*\*\*

_Commentary_

_Application Notes:_

1.    Except where prohibited by statute or by the guideline applicable to the offense in Chapter Two, ~~the guidelines authorize, but do not require,~~ a sentence of probation ==is presumed to be appropriate== in the following circumstances:

    (A) _Where the applicable guideline range is in the Zone A of the Sentencing Table (i.e., the minimum term of imprisonment specified in the applicable guideline range is zero months)._  In such cases, a condition requiring a period of community confinement, home detention, or intermittent confinement may be imposed but is not required.

    (B) _Where the applicable guideline range is in Zone B of the Sentencing Table (i.e., the minimum term of imprisonment specified in the applicable guideline range is at least one but not more than nine months)._  In such cases, ~~the court may impose~~ probation ==is presumed to be appropriate== only if ~~it~~ ==the court== imposes a condition or combination of conditions requiring a period of community confinement, home detention, or intermittent confinement sufficient to satisfy the minimum term of imprisonment specified in the guideline range. For example, where the offense level is 7 and the criminal history category is II, the guideline range from the Sentencing Table is 2-8 months.  In such a case, ~~the court may impose~~ a sentence of probation ==is presumed to be appropriate== only if ~~it~~ ==the court== imposes a condition or conditions requiring at least two months of community confinement, home detention, or intermittent confinement, or a combination of community confinement, home detention, and intermittent confinement totaling at least two months.

2.    ==The presumption in subsection (a) and Application Note 1 may be rebutted by a government showing that the factors set forth in 18 U.S.C. § 3553(a) compel a term of imprisonment.==

~~2~~3.    Where the applicable guideline range is in Zone C or D of the Sentencing Table (_i.e._, the minimum term of imprisonment specified in the applicable guideline range is ten months or more), the guidelines do not authorize a sentence of probation.  _See_ §5C1.1 (Imposition of a Term of Imprisonment).

Appendix B

## Most states have multiple ways to impose adult sanctions on offenders of juvenile age

| State | Judicial waiver | | | Prosecutorial discretion | Statutory exclusion | Reverse waiver | Once an adult/ always an adult | Blended sentencing | |
| | Discretionary | Presumptive | Mandatory | | | | | Juvenile | Criminal |
|---|---|---|---|---|---|---|---|---|---|
| Number of states | 45 | 15 | 15 | 15 | 29 | 24 | 34 | 14 | 17 |
| Alabama | ■ | | | | ■ | | ■ | | |
| Alaska | | ■ | | | ■ | | | ■ | |
| Arizona | ■ | | | ■ | ■ | ■ | ■ | | |
| Arkansas | ■ | | | ■ | | ■ | | ■ | ■ |
| California | ■ | ■ | | ■ | ■ | | ■ | | ■ |
| Colorado | ■ | ■ | | ■ | | ■ | | ■ | ■ |
| Connecticut | | | ■ | | | ■ | | ■ | |
| Delaware | ■ | | ■ | | ■ | ■ | ■ | | |
| Dist. of Columbia | ■ | ■ | | ■ | | | ■ | | |
| Florida | ■ | | | ■ | ■ | | ■ | | |
| Georgia | ■ | | ■ | ■ | ■ | ■ | | | |
| Hawaii | ■ | | | | | | ■ | | |
| Idaho | ■ | | | | ■ | | ■ | | ■ |
| Illinois | ■ | ■ | ■ | | | | ■ | ■ | ■ |
| Indiana | ■ | | ■ | | ■ | | ■ | | |
| Iowa | ■ | | | | ■ | ■ | ■ | | ■ |
| Kansas | ■ | ■ | | | | | ■ | ■ | |
| Kentucky | ■ | | ■ | | | ■ | | | ■ |
| Louisiana | ■ | | ■ | ■ | ■ | | | | |
| Maine | ■ | ■ | | | | | ■ | | |
| Maryland | ■ | | | | ■ | ■ | ■ | | |
| Massachusetts | | | | | ■ | | | ■ | ■ |
| Michigan | ■ | | | ■ | | | ■ | ■ | ■ |
| Minnesota | ■ | ■ | | | ■ | | ■ | ■ | |
| Mississippi | ■ | | | | ■ | ■ | ■ | | |
| Missouri | ■ | | | | | | ■ | | ■ |
| Montana | | | | ■ | ■ | ■ | | ■ | |
| Nebraska | | | | ■ | | ■ | | | ■ |
| Nevada | ■ | ■ | | | ■ | ■ | ■ | | |
| New Hampshire | ■ | ■ | | | | | ■ | | |
| New Jersey | ■ | ■ | ■ | | | | | | |
| New Mexico | | | | | ■ | | | ■ | ■ |
| New York | | | | | ■ | ■ | | | |
| North Carolina | ■ | | ■ | | | | ■ | | |
| North Dakota | ■ | ■ | ■ | | | | ■ | | |
| Ohio | ■ | | ■ | | | | ■ | ■ | |
| Oklahoma | ■ | | | ■ | ■ | ■ | ■ | | ■ |
| Oregon | ■ | | | | ■ | ■ | ■ | | |
| Pennsylvania | ■ | ■ | | | ■ | ■ | ■ | | |
| Rhode Island | ■ | ■ | ■ | | ■ | | ■ | ■ | |
| South Carolina | ■ | | ■ | | ■ | | | | |
| South Dakota | ■ | | | | ■ | ■ | | | |
| Tennessee | ■ | | | | | ■ | ■ | | |
| Texas | ■ | | | | | | ■ | ■ | |
| Utah | ■ | ■ | | | ■ | | ■ | | |
| Vermont | ■ | | | ■ | ■ | ■ | | | |
| Virginia | ■ | | ■ | ■ | | ■ | ■ | | ■ |
| Washington | ■ | | | | ■ | | ■ | | |
| West Virginia | ■ | | ■ | | | | | | ■ |
| Wisconsin | ■ | | | | ■ | ■ | ■ | | ■ |
| Wyoming | ■ | | | ■ | | ■ | | | |

■ In states with a combination of provisions for transferring juveniles to criminal court, the exclusion, mandatory waiver, or prosecutorial discretion provisions generally target the oldest juveniles and/or those charged with the most serious offenses, whereas younger juveniles and/or those charged with relatively less serious offenses may be eligible for discretionary waiver.

Note: Table information is as of the end of the 2011 legislative session.

Source: Authors' adaptation of OJJDP's *Statistical Briefing Book* [online].